James P. THOMAS and Mary Lou
Thomas, Petitioners,

·v.

COMMISSIONER OF INTERNAL
REVENUE, Respondent.

No. 85–1954.

United States Court of Appeals,
Fourth Circuit.

Argued Jan. 7, 1986.

Decided June 6, 1986.

Elliot I. Miller, New York City, for petitioners.

Bruce R. Ellisen, Tax Div., Dept. of Justice (Roger M. Olsen, Acting Asst. Atty. Gen., Glenn L. Archer, Jr., Asst. Atty. Gen., Michael L. Paup, Washington, D.C., on brief) for respondent.

Before ERVIN and WILKINSON, Circuit Judges, and BUTZNER, Senior Circuit Judge.

BUTZNER, Senior Circuit Judge:

The Tax Court held that the Wise County Mining Program was not organized with the primary objective of making a profit. Therefore, James P. Thomas and Mary Lou Thomas (taxpayers) could not deduct their share of the program's losses pursuant to I.R.C. §§ 162(a) and 616(a).* Accordingly, the court upheld the Commissioner's assessment of a deficiency in the taxpayers' 1978 income tax return. We affirm.

## I

The facts in this case are fully set forth in the Tax Court's opinion. *See Thomas v. Commissioner*, 84 T.C. 1244, 1245–67 (1985). They may be summarized for purposes of this appeal. The Wise County Mining Program was organized by Samuel L. Winer to sublease and mine a coal seam in Wise County, Virginia. The program entered into a contract with Shelton Coal Corporation, which undertook to mine the property for a fee. Shelton agreed to mine a minimum of 120,000 tons of coal per year for the life of the project unless its performance was excused by *force majeure.*

The program was financed with $912,500 in cash and $1,930,000 in nonrecourse notes furnished by investors in the program. The notes were executed in favor of Shelton and were to be paid with proceeds from the sale of coal. Shelton agreed that if it did not meet its annual mining commitments, it would pay liquidated damages to the investors sufficient to enable them to amortize the notes. The amortization of the notes and the payment of offsetting damages were accomplished through bookkeeping entries. Thus, the investors were not required to contribute any cash beyond their initial payment.

---

* Section 162(a) allows a deduction for "all the ordinary and necessary expenses paid or incurred ... in carrying on any trade or business." Section 616(a) allows a deduction for "all expenditures paid or incurred ... for the development of a mine or other natural deposit ... if paid or incurred after the existence of ores or minerals in commercially marketable quantities has been disclosed."

In December 1978, James P. Thomas purchased an interest in the program by paying $25,000 in cash and executing a $52,162 nonrecourse note. Pursuant to I.R.C. § 761(a), Thomas and the other investors elected exclusion from the partnership provisions of Subchapter K of the Code, §§ 701–761. This enabled the investors to avoid the "at risk" provision of I.R.C. § 704(d) which would have limited their deductions to the amount of cash that they contributed.

On their 1978 return, the taxpayers reported a deduction of $73,243 as their share of the program's losses for 1978. This deduction reduced their taxes by $37,411. Thus, regardless of whether any coal was mined, Thomas was guaranteed a return of $37,411 on his $25,000 investment if the deductions were allowable.

Shelton began mining in January 1979. It encountered unmapped old mine works which created a dangerous condition in the mine. This danger prompted the Mine Safety Health Administration to order that the mine be closed in August 1979. Accordingly, Shelton suspended its operations and informed Winer that it was invoking the *force majeure* provision in its contract.

In October 1979, Shelton offered to develop an alternative site but the investors would not agree to pay a higher mining fee. Shelton eventually subcontracted with Triangle Mining Company to mine the original property. Triangle mined this site from October 1981 through June 1982 but was forced to halt its operations due to flooding and depressed market conditions.

The Tax Court found that a total of 57,352 raw tons of coal had been mined which produced 36,823 clean tons with gross sales of $873,543. The net proceeds to the program totalled $48,237. Thomas's share of these proceeds was $1,287.

In sustaining the Commissioner's disallowance of the 1978 deduction of $73,243, the Tax Court held that the mining venture "was not an activity engaged in with the primary and predominant objective of realizing an economic profit." 84 T.C. at 1270. The court found that the primary objective "was to secure tax benefits rather than to earn an economic profit." 84 T.C. at 1279–80. The court based its ultimate finding on the following subsidiary findings: tax considerations provided the foundation for the program's actions, the nonrecourse notes had no "valid business purpose," 84 T.C. at 1282, and were intended to provide tax deductions, preliminary investigations of the viability of the undertaking were superficial, the program's activities were not conducted in a businesslike manner, and there was scant investigation of the marketability of the coal at the projected price.

## II

The taxpayers' two principal assignments of error are: (1) the Tax Court erred as a matter of law because it ignored the legal principles applicable for determining profit motive, and (2) the Tax Court erroneously applied the law in finding a lack of profit motive because every basis of its decision is legally wrong. The taxpayers emphasize that their principal objections raise issues of law, not of fact.

The Tax Court upheld the Commissioner's assessment of a deficiency on the ground that the program was not organized with the primary objective of making a profit. In this context, as the Tax Court pointed out, " 'primary' means 'of first importance' or 'principally,' and 'profit' means economic profit, independent of tax savings." 84 T.C. at 1269.

The taxpayers contend that the court should have applied the "sham transaction" test. In *Rice's Toyota World, Inc. v. Commissioner*, 752 F.2d 89 (4th Cir.1985), we held that a sale and lease back transaction will be treated as a sham and any deductions will be disallowed if "the taxpayer was motivated by no business purposes other than obtaining tax benefits in entering the transaction, and . . . the transaction has no economic substance because no reasonable possibility of a profit exists." 752 F.2d at 91. The taxpayers contend that the program was not a sham because it had economic substance. Therefore, they say,

"the subjective intent of the Taxpayers is irrelevant . . . ."

■■■ We reject this argument. The Commissioner did not disallow the taxpayers' deductions on the ground that the program was a sham. Instead, the Commissioner asserted that the program lacked the primary objective of making a profit. These are different grounds for invalidating deductions. *See* Sanderson v. Commissioner, 1985 T.C.M. (P–H) ¶ 85,477 at 2140 n. 15. If a business has the primary objective of making a profit, deductions pertaining to a specific transaction may or may not be allowed depending on whether the transaction is a sham. *See, e.g., Rice's Toyota World*, 752 F.2d at 91–92. The issue in this case is more fundamental. It is whether the mining venture itself has the primary objective of making a profit.

■■■ Nor can we accept the taxpayers claim that deductions attributed to mining activity should be allowed on the ground that they satisfied the requirements of §§ 162(a) and 616(a). The major premise for the allowance of these deductions is that they arise out of a venture whose primary objective is to make a profit. *See Surloff v. Commissioner*, 81 T.C. 210, 232–33 (1983). Consequently, the Tax Court did not err in its analysis of the legal issues involved in this case. In order to determine whether the claimed deductions were allowable, it properly inquired whether the mining venture's primary objective was to make a profit. In *Malmstedt v. Commissioner*, 578 F.2d 520, 527 (4th Cir.1978), speaking of deductions claimed under § 162(a), we said: "The test is whether the business was undertaken 'in good faith for the purpose of making a profit.'" There is no principled reason why the same test should not apply to determine whether mining development costs can be deducted under § 616(a).

## III

The Tax Court's determination that the program lacked the primary objective of making a profit is a finding of fact that ordinarily cannot be set aside unless it is clearly erroneous. *Tallal v. Commissioner*, 778 F.2d 275, 276 (5th Cir.1985); *Faulconer v. Commissioner*, 748 F.2d 890, 895 (4th Cir.1984). The taxpayers contend, however, that the court erred as a matter of law in considering much of the evidence.

The court considered the investors' decision to elect out of the partnership provisions of §§ 701–761. This enabled them to avoid § 704(d) which would have limited their deductions to the amount of their cash investment. However, as a consequence of this action, Shelton was prohibited from entering into long-term coal sales contracts on behalf of the investors. *See* 26 C.F.R. § 1.761–2(a)(3)(iii) (1985). This prohibition was disadvantageous to the investors because mining operations were projected to last 10 years. Thus, Shelton would not be able to utilize long-term contracts to guard against decreases in the price of coal. The program's offering memorandum acknowledged this disadvantage. The Tax Court viewed the disadvantageous limitation on long-term contracts as evidence that tax benefits were of greater concern to the investors than profitability.

The taxpayers contend that utilization of a Code provision that confers tax benefits cannot as a matter of law give rise to an inference of tax avoidance. In contrast, the Commissioner asserts that the primary purpose of the program was to generate tax benefits. He points out that election out of partnership status facilitated this purpose, and it also jeopardized the profitability of the program.

■■■ We conclude that the Tax Court did not err by considering the taxpayers' election to take advantage of the tax benefit conferred by § 761(a) and the disadvantage to profitability that this entailed. The evidence was relevant to establish whether the primary objective of the mining venture was to make a profit. Therefore, the evidence was admissible. *See* Fed.R.Evid. 401, 402.

We also reject the related argument that affirmance of the Tax Court will preclude

all taxpayers from being able to utilize the election provided by § 761(a). In some situations the inability to enter into long-term contracts will not be disadvantageous. In other contexts there will be sufficient evidence of a dominant profit motive to overcome any adverse inferences from this election. Thus, consideration of the consequences of this election will not always preclude its use.

■ The Tax Court also contrasted the abundant discussion of tax benefits with the superficial analysis of the program's potential for profit in the program's offering memorandum. The court found that this was additional evidence that tax benefits were of greater concern than profits. The taxpayers assert that an analysis of the program's tax consequences is required by 31 C.F.R. § 10.33 (1985), and that they are being penalized for doing what the law requires. In like vein, the taxpayers urge that it was error for the tax court to consider the offering's list of risks associated with the program. They claim that they are being penalized because of the program's compliance with the disclosure requirements of the securities laws.

The significance of the offering memorandum is its emphasis on the favorable tax consequences of the program in comparison to its superficial analysis of profitability. Addressing a similar situation in *Rice's Toyota World*, 752 F.2d at 93, we observed:

> The record contains additional support for drawing the ultimate inference that Rice was not motivated by potential profit. First off, Finalco's literature emphasized the large tax deductions the transaction would produce, not the potential for profit. To the contrary, the literature warned of great difficulty in predicting residual values.

Thus, precedent sustains the Tax Court. The inferences that it drew from the offering memorandum were reasonable and relevant.

■ None of the other assignments of error directed at the Tax Court's consideration of the evidence or to the inferences the Tax Court drew from the historical facts has merit. The use of nonrecourse notes, the shortfall in projected earnings, operational changes to protect the ventures' tax position, and notice to the investors of disappointing news about the venture accompanied by a solicitation for other tax sheltered investments are all relevant to the inquiry the court was required to make about the primary objective of the program. *See, e.g., Brannen v. Commissioner*, 722 F.2d 695, 702–05 (11th Cir.1984); *Seaman v. Commissioner*, 84 T.C. 564, 595–96 (1985); *Surloff v. Commissioner*, 81 T.C. 210, 237–38 (1983). Indeed, whether profit was the primary objective of the venture must be determined on the basis of all the facts and circumstances. 26 C.F.R. § 1.183–2(b) (1985); *Tallal v. Commissioner*, 778 F.2d 275 (5th Cir.1986); *Flowers v. Commissioner*, 80 T.C. 914, 931–32 (1983).

## IV

The taxpayers' final contention is that the court's factual finding that the program lacked a predominant profit objective is clearly erroneous. They assert that the court's "account of the evidence is implausible in light of the record." In support of this claim, the taxpayers discuss 25 facts that support their assertion that the primary objective of the program was to realize a profit.

■ The Supreme Court has held that "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson v. City of Bessemer City*, 470 U.S. 564, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985). The Tax Court's findings of fact are amply supported by the evidence and the inferences it drew from the facts are reasonable. We have no hesitancy in affirming its judgment. Even if we were to assume that the taxpayers' view of the evidence were also permissible, *Anderson* requires us to affirm.

AFFIRMED.