Lewis Arthur MERRYMAN,
Petitioner–Appellant,

v.

COMMISSIONER OF INTERNAL
REVENUE, Respondent–Appellee.

Michael A. CARROLL and Margaret W.
Carroll, Petitioners–Appellants,

v.

COMMISSIONER OF INTERNAL
REVENUE, Respondent–Appellee.

No. 88–4382.

United States Court of Appeals,
Fifth Circuit.

May 30, 1989.

Tracey A. Williams, Edwin K. Hunter, Hunter & Boland, Lake Charles, La., for petitioners-appellants.

William F. Nelson, Chief Counsel, I.R.S., Robert A. Bernstein, Asst. Atty. Gen., Gary R. Allen, Chief, William S. Rose, Jr., David E. Brunori, Asst. Attys. Gen., Appellate Section, Tax Div., Dept. of Justice, Washington, D.C., for respondent-appellee.

Before REAVLEY, WILLIAMS, and JONES, Circuit Judges.

EDITH H. JONES, Circuit Judge:

Appellants Lewis Arthur Merryman, Michael A. Carroll, and Margaret W. Carroll contest federal income tax deficiencies for the calendar year 1980. The Commissioner of Internal Revenue disallowed these petitioners' deductions and investment tax credits attributable to their respective proportionate interests in the Keeman Company ("Keeman"), a Louisiana general partnership. The Tax Court concluded that the Keeman partnership lacked economic substance and should be disregarded for tax purposes. We do not find the conclusion clearly erroneous, hence we affirm.

## BACKGROUND

During 1980, Pernie Bailey Drilling Co. ("Pernie Bailey") was a closely held oil and gas drilling company incorporated in Texas. Pernie Bailey drilled oil and gas wells in Texas and Louisiana for major and independent oil and gas companies. In 1980 it owned and operated five drilling rigs. Until April 1, 1980 all of the stock in Pernie Bailey was owned by William Washburn and members of his immediate family, including his daughter, appellant Margaret W. Carroll. On that day, William Washburn and the members of his immediate family formed the Washburn Company, a family partnership, to which they transferred all of their stock in Pernie Bailey.

On December 15, 1980, the key employees and officers of Pernie Bailey, along with Pernie Bailey and the Washburn Company, formed the Keeman general partnership. The Keeman partnership agreement required the partners to contribute a total of $1,000 in capital. Under the agreement, Pernie Bailey was the managing partner of Keeman and was given full and sole control over partnership affairs. Concurrent with Keeman's formation, Pernie Bailey sold Keeman an oil rig which it had recently constructed for the sales price of $2,250,-000. Keeman made no down payment, rather it became obligated to pay for the rig in installments of $39,718.65 per month for seven years, with interest to accrue on the purchase price at the rate of twelve percent (12%) per year. Also on December 15, 1980, Pernie Bailey and Keeman entered into a "Rig Management Agreement" which called for Pernie Bailey to manage all aspects of the operation of the oil rig for a six-month period beginning December 15, 1980 and continuing for successive six-month terms. In addition to reimbursing Pernie Bailey for all of its direct costs of operating the rig, the Keeman partnership agreed to pay Pernie Bailey a management fee of $500 each day the rig was operated as reimbursement to Pernie Bailey for its overhead costs not directly chargeable to the rig. As it turned out, the accrued net operating profits were not paid by Pernie Bailey to Keeman on a timely basis, and payments due on the partnership's promissory note to Pernie Bailey likewise were not paid on time.

On June 30, 1981, the partners of Keeman entered into a tax-free exchange whereby they transferred the assets and liabilities of Keeman to Southland Energy Corporation ("Southland"), a company owned by the same persons and entities as Keeman. Internal Revenue Code ("IRC") § 351. The Keeman partners received 100 shares of Southland stock, and their partnership thus dissolved less than one year after its formation. The 100 shares of Southland common stock were allocated among the partners commensurate with their ownership percentages in Keeman.

Keeman's partnership income tax return for its taxable year ending December 31, 1980, after interest and depreciation, reflected a net loss of $16,198.85 and an investment tax credit with respect to the oil rig in the amount of $225,000. Keeman's return for its taxable period ending June 30, 1981, after interest and depreciation, reflected a net loss of $41,825. On his 1980 joint federal income tax return, Lewis Merryman claimed an investment tax credit of $15,087 and a $1,421 loss with respect to his share of Keeman's net loss. On their untimely filed 1980 joint federal income tax return, Margaret W. Carroll and her husband claimed an investment tax credit of $3,486.60, and a $251 loss with respect to Margaret Carroll's interest in the Washburn Company, which was a partner in Keeman.

The Commissioner disallowed the investment tax credits and the losses claimed with respect to Mr. Merryman's and Mr. and Mrs. Carroll's interests in Keeman. The Commissioner believed that the Keeman partnership should be disregarded for tax purposes because it was formed as a sham partnership with no true business or economic purpose other than to obtain the investment tax credits and tax losses.[1]

---

1. The Commissioner alternatively claimed that if the partnership is not disregarded for tax purposes, then the rig management agreement entered into by Pernie Bailey and the Keeman

The Tax Court sustained the deficiency determinations and found that the Keeman partnership should be disregarded for federal income tax purposes. The Tax Court held that while the oil rig was built and operated for a profit, the formation and role of the partnership served no other purpose except tax avoidance. In affirming the deficiency determinations, the Tax Court concluded that Keeman should not be recognized for tax purposes. The taxpayers now appeal.

## DISCUSSION

 It is a long-settled rule of law that transactions which have no economic purpose or substance other than the creation of income tax losses or credits are to be disregarded for tax purposes. *Knetsch v. United States*, 364 U.S. 361, 366, 81 S.Ct. 132, 135, 5 L.Ed.2d 128, 132 (1960); *Gregory v. Helvering*, 293 U.S. 465, 469–70, 55 S.Ct. 266, 267–68, 79 L.Ed. 596, 599 (1935); *Killingsworth v. Commissioner*, 864 F.2d 1214, 1216 (5th Cir.1989); *Boynton v. Commissioner*, 649 F.2d 1168, 1172 (5th Cir.1981), *cert. denied*, 454 U.S. 1146, 102 S.Ct. 1009, 71 L.Ed.2d 299 (1982); *Swaim v. United States*, 651 F.2d 1066 (5th Cir.1981); *Kuper v. Commissioner*, 533 F.2d 152 (5th Cir.1976). To determine whether economic substance is present, courts view the objective realities of the transaction or, in other words, whether what was actually done is what the parties to the transaction purported to do. *Gregory*, 293 U.S. at 469, 55 S.Ct. at 267; *Killingsworth*, 864 F.2d at 1216. In the instant case, the Tax Court stated that the operation of the oil rig, that is, the "underlying transaction," had economic substance and was entered into for profit. The Tax Court further found, however, that the formation and role of the Keeman partnership lacked economic substance and served no purpose other than to create tax benefits for its partners. The issue, therefore, is not whether the operation of the oil rig had economic substance, but whether the formation of the partnership had such substance. Courts have rejected the form of a transaction even when the underlying activity, as in this case the operation of the oil rig, was not a sham. *See, e.g., Packard v. Commissioner*, 85 T.C. 397, 419 (1985) (S-corporation disregarded for tax purposes even though underlying investment held not a sham).

The Supreme Court has described the following test to determine when a transaction should be recognized for tax purposes:

[W]here ... there is a genuine multiple-party transaction with economic substance which is compelled or encouraged by business or regulatory realities, is imbued with tax independent considerations, and is not shaped solely by tax-avoidance features that have meaningless labels attached, the Government should honor the allocation.

*Frank Lyon Co. v. United States*, 435 U.S. 561, 583–84, 98 S.Ct. 1291, 1303–04, 55 L.Ed.2d 550, 567 (1978). *See also Holladay v. Commissioner*, 649 F.2d 1176, 1179 (5th Cir.1981) (existence of a tax benefit from a transaction does not automatically mean it is a sham so long as it is imbued with tax-independent considerations). Courts accordingly compare the transaction in question with transactions that might usually be expected to occur in bona fide business settings. *Estate of Baron v. Commissioner*, 798 F.2d 65, 71–74 (2d Cir. 1986); *Hilton v. Commissioner*, 74 T.C. 305, 344–46 (1980), *aff'd*, 671 F.2d 316 (9th Cir.1982), *cert. denied*, 459 U.S. 907, 103 S.Ct. 211, 74 L.Ed.2d 168 (1982); *Thomas v. Commissioner*, 792 F.2d 1256, 1259 (4th Cir.1986); *Brannen v. Commissioner*, 722 F.2d 695, 704 (11th Cir.1984).

 The petitioning taxpayers in the instant case agree with the law applied by the Tax Court but disagree with the court's factual findings. The appropriate appellate standard of review is whether the Tax Court's findings of fact were clearly erroneous. *Commissioner v. Duberstein*, 363

partnership should be considered a lease with an indefinite term, which would invalidate the investment tax credit under IRC Section 46(e)(3)(B). Because the Tax Court agreed that the partnership lacked economic substance, it did not address this issue. Although the taxpayers briefed this issue in our court, we also pretermit its discussion.

U.S. 278, 291, 80 S.Ct. 1190, 1200, 4 L.Ed.2d 1218 (1960); *Killingsworth*, 864 F.2d at 1217; *Laney v. Commissioner*, 674 F.2d 342, 345 (5th Cir.1982). Further, at the Tax Court level, the Commissioner's determination that the partnership lacked economic substance was presumptively correct and the taxpayers bore the burden of proving the determination erroneous. *Estate of Baron*, 798 F.2d at 72; *Larsen v. Commissioner*, 89 T.C. 1229, 1253 (1987); Rule 142, Rules of Practice and Procedure of the United States Tax Court.

■ Although this case is not without doubt, there exists considerable evidence supporting the Tax Court's conclusion that the formation and function of the Keeman partnership lacked economic purpose and profit motive. Keeman functioned as an instrument through which Pernie Bailey could retain control of the oil rig while passing on various tax advantages to its partners. Keeman's managing partner was Pernie Bailey, and its partners included William Washburn, the president and chairman of Pernie Bailey, and the Washburn Company, the sole shareholder of Pernie Bailey. While Pernie Bailey as managing partner was given complete control of the partnership's affairs, the record indicates William Washburn made the ultimate decisions. On the day of its formation, Keeman purchased the oil rig from Pernie Bailey and simultaneously surrendered total control of the rig back to Pernie Bailey. This pattern of interconnected ownership of Keeman and related entities and lack of obvious business purpose in the parties' dealings is evidence that the partnership's formation and activities lacked economic substance. *Professional Services v. Commissioner*, 79 T.C. 888, 925 (1982).

Further, although Article IV of the partnership agreement required contributions of capital by the partners, the record shows that only Pernie Bailey, which was required to pay a $100 capital contribution, actually paid the entire $1,000 required from all the partners.[2] Such a failure of the partners to contribute capital to the partnership is evidence of a sham transaction. *LaFarque v. Commissioner*, T.C.M. 1985–630. *See also Commissioner v. Culbertson*, 337 U.S. 733, 737–40, 69 S.Ct. 1210, 1212–13, 93 L.Ed. 1659, 1663–64 (1949).

Despite the substantial purchase price of $2,250,000 for the rig, no down payment was required from Keeman but rather a promissory note was executed for the entire amount. Further, Keeman waived all warranties on the purchase of this costly piece of machinery. This sale by the managing partner on exceedingly favorable terms to the partnership raises doubts about the existence of an arms-length deal and provides evidence of a transaction lacking economic substance. *Rose v. Commissioner*, 88 T.C. 386 (1987), *aff'd*, 868 F.2d 851 (6th Cir.1989); *Helba v. Commissioner*, 87 T.C. 983, 1005 (1986), *aff'd*, 860 F.2d 1075 (3d Cir.1988). Here, in fact, Pernie Bailey became both mortgagee and co-mortgagor on the note.

Throughout Keeman's existence, money flowed back and forth but the economic positions of the parties were not altered. Thus Pernie Bailey, even after the rig's sale, remained in sole control and possession of the rig and continued to operate it without informing third parties of the change in ownership. The agreement and sales contract with Keeman allowed Pernie Bailey to operate the rig, collect the revenues, and remit the net revenue after expenses to Keeman, with the money then returned to Pernie Bailey in the form of note payments from Keeman. Such a circular flow of funds among related entities does not indicate a substantive economic transaction for tax purposes. *Karme v. Commissioner*, 73 T.C. 1163, 1186–87 (1980), *aff'd*, 673 F.2d 1062 (9th Cir.1982); *Zirker v. Commissioner*, 87 T.C. 970, 976 (1986).

In fact, once the Rig Management Agreement had been signed, there was lit-

---

**2.** The taxpayers contend that this conclusion is patently wrong because the partners testified that they all put up money toward the partnership's formation. The total amount of their contributions, even if made, was still $1,000, a paltry sum compared with the magnitude of the venture they were undertaking.

tle evidence of the existence of the partnership. The record indicates that the partnership had no office or employees, paid no salaries, and carried on no other business dealings. As the Tax Court has earlier stated, where a partnership owns no property, maintains no books or records, and does not hold itself out as being engaged in business, there is a lack of economic substance. *Cirelli v. Commissioner*, 82 T.C. 335, 346–47 (1984).

Both Keeman and Pernie Bailey failed to follow the terms of the Rig Management Agreement and the sales contract. The first payment to Pernie Bailey under the promissory note was not made until June 25, 1981, even though payments had been due on the 15th of every month since January 15, 1981; payments due on May 15, 1981 and June 15, 1981 were made on June 29, 1981. Similarly, Keeman paid the December 1980 $500/day rig management fee on June 29, 1981 and paid the fees for January through June of 1981 only in October 1981. Pernie Bailey paid Keeman the 1980 net revenue three months late, without the required 12 percent interest charge. Keeman never distributed any funds to its partners as partnership contributions, and the funds that were available for distribution were transferred to Southland in early 1982. The low degree of adherence to the entities' contractual terms indicates lack of substance. *Rose v. Commissioner*, 88 T.C. 386, 410–11 (1987), *aff'd*, 868 F.2d 851 (6th Cir.1989); *Helba*, 87 T.C. at 1009.

The taxpayers contend that there were valid non-tax reasons for the formation of the partnership and that, contrary to the Tax Court's finding, they did bear the risk of the enterprise. They allege that Keeman was formed to allow key employees to participate in the growth of the business and to provide them with an incentive to remain with Pernie Bailey during what was then a boom time in the oil business. The partners who were benefitted by the formation of Keeman so testified. Although we sympathize with the taxpayers' theory, we cannot hold the Tax Court's rejection of their position to be clearly erroneous. The Keeman partners stood to benefit not only from the partnership's earnings, if any, but from its considerable potential tax advantages. They contributed no capital. Although the key employees participated in Keeman's business from an operational standpoint, they did so as employees of Pernie Bailey and so risked no loss of individual income. There was little likelihood that Pernie Bailey as rig seller and manager of Keeman would hold the partners individually liable for arrearages on note payments or management fees, while Pernie Bailey's management agreement insulated them from personal exposure to many operational risks. According to the partners' testimony, when a material risk of liability for drilling operations appeared, in the looming necessity for them to purchase reservoir loss insurance, the partners decided to sell out of Keeman rather than face the risk or insurance expense. Finally, the Tax Court was not clearly erroneous in its suggestion that although Keeman was nominally a partnership, William Washburn controlled the decision-making for it as well as the related entities.

Fairly read, the record contains substantial evidence supporting the Tax Court's conclusion that the Keeman partnership lacked economic substance apart from the business in which it briefly engaged. No one fact is conclusive, but taken together, they require us to affirm the Tax Court.

Because we find that the Tax Court did not err in holding that the partnership should be disregarded for federal income tax purposes, we AFFIRM.

REAVLEY, Circuit Judge, dissenting:

Despite my great deference for the opinion of my colleagues and for the finding of the Tax Court, it is impossible for me to say that the Keeman Company had no economic substance. The purpose of this partnership was to reward key employees of Pernie Bailey by allowing them to participate in the profits and in the ownership of a substantial asset without changing the Washburn family ownership of Pernie Bailey itself. No one has ever suggested any reason to doubt that this was the bona fide purpose of the parties.

Without a finding that Keeman, and all of the dealings by the partners with respect to Keeman, were only dishonest pretense—and no such finding has been made

—the statements that the economic positions of the parties were not altered and that the partners faced no financial risk and shared no risks of ownership cannot be justified. The Keeman partnership bought an expensive oil rig, signed a note for 2.25 million dollars, obligated itself to pay Pernie Bailey $500 per operating day management fee, gained the right to profits and risked the loss of its rig and liability for its debts. Those are the realities of this case, despite the majority's references to favorable terms and delayed payments and the majority's unwarranted speculation about the "little likelihood that Pernie Bailey ... would hold the partners individually liable for arrearages...."

The Supreme Court has said that we are to look to the taxpayer's good faith and subjective business purpose. *Commissioner of Internal Revenue v. Culbertson*, 337 U.S. 733, 742, 69 S.Ct. 1210, 1214, 93 L.Ed. 1659 (1949). So long as there are tax-independent considerations, taxpayers may structure their operations even to obtain tax benefits. If so, this case is being decided incorrectly.

I would remand to the Tax Court for findings on the government's contention that the management agreement was actually a lease so as to make an investment tax credit unallowable.