WILLIS J. DUHON AND MARIE A. DUHON, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Duhon v. Commissioner
Docket No. 2407-89
United States Tax Court
T.C. Memo 1991-369; 1991 Tax Ct. Memo LEXIS 418; 62 T.C.M. (CCH) 382; T.C.M. (RIA) 91369; August 7, 1991, Filed *418 Decision will be entered for the respondent. Edwin K. Hunter and Tracey A. Williams, for the petitioners. Albert A. Balboni and Carol Bingham McClure, for the respondent. COLVIN, Judge. COLVIN
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined deficiencies in petitioners' Federal income tax of $ 6,880 and $ 32,594 for 1977 and 1980, respectively, and increased interest under section 6621(c). The issues for decision are: (1) Whether a partnership, the Keeman Company, should be disregarded for Federal income tax purposes. This issue was previously decided for respondent in a case brought by another Keeman Company partner. Merryman v. Commissioner, 873 F.2d 879 (5th Cir. 1989), affg. T.C. Memo 1988-72. (2) If we decide that the partnership is to be recognized for Federal income tax purposes, (a) whether the rig management agreement entered into between the partnership and Pernie Bailey Drilling Company is a management agreement and not an indefinite lease for purposes of the noncorporate lessor provisions of section 46(e)(3), and (b) whether petitioners are entitled to an investment tax credit carryback to *419 1977. (3) Whether petitioners are liable for increased interest under section 6621(c) for 1977 and 1980. As discussed below, we hold, as in Merryman v. Commissioner, supra, that the Keeman Company partnership should not be recognized for Federal income tax purposes. We further hold that petitioners are liable for increased interest under section 6621(c). All section references are to the Internal Revenue Code in effect for the taxable years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure. FINDINGS OF FACT The stipulations of fact submitted by the parties included language that was derived in large part from the findings of fact in Merryman v. Commissioner, supra.
1. Background
Petitioners resided in Lafayette, Louisiana, when the petition was filed. The issues in this case arise out of the relationship between Pernie Bailey Drilling Company (Pernie Bailey), a closely held oil and gas drilling company, and a number of related entities. Petitioner was employed as treasurer by Pernie Bailey from 1975 to 1984, and was vice president and secretary treasurer for the years including 1980 *420 to 1981. Petitioner was employed from 1957 to 1971 by Texaco, Deerfield Oil Company, and Circle Drilling Company, primarily in accounting-related positions, and was administrator of a law firm from 1971 to 1975. 2. Pernie Bailey Drilling Company and Southland Energy Corporation
Pernie Bailey was incorporated under the laws of Texas in the early 1940s. Pernie Bailey's principal office is in Houston, Texas. Pernie Bailey drills oil and gas wells in Texas and Louisiana for major and independent oil and gas companies. When formed, Pernie Bailey owned one drilling rig. By 1980, Pernie Bailey owned five drilling rigs. The officers and key employees of Pernie Bailey were the following: President and Chairman of the Board of Directors
William Washburn
Vice President and Controller
Willis Duhon
(petitioner)
Operations Manager
O. D. Pharris
Engineer
John Washburn
Drilling Superintendent
Lewis Merryman In 1977, Southland Energy Corporation (Southland), a Louisiana corporation, was formed as a vehicle through which the key employees of Pernie Bailey could obtain interests in oil and gas exploration and development leases. Through June 30, 1981, the stock of Southland *421 was owned as follows: Shares
Percentage
Shareholder
Held
Interest
Pernie Bailey
34
29.825
William Washburn
20
17.545
Willis Duhon (petitioner)
20
17.544
O. D. Pharris
20
17.544
John Washburn
10
8.771
Lewis Merryman
10  8.771
Total
114
100.000
Southland did not own a drilling rig, but typically hired drilling companies to drill wells with respect to the leases it acquired. Prior to April 1, 1980, all of the stock of Pernie Bailey was owned by William Washburn and members of his immediate family. On April 1, 1980, The Washburn Company, a family partnership, was formed under Louisiana law, and the members of the Washburn family transferred their stock in Pernie Bailey to the partnership. William Washburn owned a 29.8761 percent interest in The Washburn Company in his individual capacity and a 15.4091 percent interest therein jointly with his wife. The seven Washburn children each owned a 7.8164 percent interest in The Washburn Company. In December 1980, Pernie Bailey contracted with Champlin Petroleum Company to drill additional oil and gas wells in Burleson County, Texas. Pernie Bailey did not have a rig available *422 for this job, so it purchased necessary parts and constructed an additional drilling rig. The other five drilling rigs it owned had been purchased as completed rigs. It cost Pernie Bailey $ 1.6 million to construct the new rig (Rig 21). 3. The Keeman Company Partnership
Pernie Bailey did not retain ownership of Rig 21 and did not contract to drill the oil and gas wells for Champlin Petroleum Company. Instead, when construction of the rig was completed on December 15, 1980, Pernie Bailey executed a deed of sale for Rig 21 to the Keeman Company (Keeman or the partnership), a general partnership formed on December 15, 1980, by the key employees of Pernie Bailey. As part of the transaction, Pernie Bailey entered into what was referred to as a "rig management agreement," or management contract with Keeman for Pernie Bailey to manage all aspects of the operation of the rig. Effectively, Pernie Bailey agreed to operate Rig 21 as if it owned the rig. Under the agreement, Pernie Bailey assumed all risk of damage to the rig caused by its gross negligence or willful misconduct. Pernie Bailey also agreed to hold harmless and to indemnify Keeman for any and all liability arising *423 from operation of the rig. While owned by Keeman, Rig 21 was managed essentially like the other Pernie Bailey rigs. The stated sales price of Rig 21 to the partnership was $ 2.25 million. No down payment was required. The entire purchase price was to be paid by Keeman in installment payments of $ 39,718.65 per month for 7 years. Interest was to accrue on the purchase price at the rate of 12 percent per year. A recourse promissory note and a chattel mortgage on the rig were executed by William Washburn on behalf of Keeman in favor of Pernie Bailey. The stated reason for the formation of Keeman and for the transfer of Rig 21 to the partnership was to provide the key employees of Pernie Bailey with a source of additional current income and with further opportunity to obtain ownership interests in different aspects of the oil and gas industry, opportunities which were not available to them through Pernie Bailey because the Washburn family was unwilling to relinquish its exclusive control of that company. Pernie Bailey needed to retain its key employees due to the shortage at that time of well-qualified oil and gas industry personnel such as O.D. Pharris (also known as John) and *424 petitioner. Petitioner thought the operation of Rig 21 would prove highly profitable, yielding large profits to him and the other key employees of Pernie Bailey. The stated reasons for not selling the rig to Southland were that Southland was engaged only in the exploration and development of oil and gas leases, not in the drilling of wells, and that Southland was reinvesting its funds in new projects with no current dividend payout to its shareholders. The initial ownership interests of the partners of Keeman were as follows: Percentage
Partner
Ownership
Pernie Bailey
10.000
The Washburn Company
19.825
William Washburn
17.545
Willis Duhon (petitioner)
17.544
O.D. Pharris
17.544
John Washburn
8.771
Lewis Merryman  8.771
Total
100.000
The above ownership interests reflect the same percentage ownership interests the key employees owned in Southland. William Washburn ran Pernie Bailey and Keeman. Decisions were made for Keeman in the same manner as for Pernie Bailey. William Washburn had the final say in all Keeman decisions, but consulted with Pernie Bailey's key employees the same as he did regarding its other rigs. O. D. Pharris *425 and Lewis Merryman oversaw its operations. William L. Green prepared the tax returns for Pernie Bailey, Southland, and Keeman during the relevant periods. The only capital funds contributed to Keeman were $ 1,000, which were transferred by Pernie Bailey to the partnership in December 1980. Petitioner's share of the capital contribution provided by Pernie Bailey was in proportion to his ownership of Keeman (i.e., about $ 175). The partnership agreement also provided that net profits or losses would be allocated to the partners in accordance with their ownership interests initially acquired upon formation of the partnership. In addition to managing the operation of Rig 21 and to assuming essentially all risks associated therewith, Pernie Bailey was to be the managing partner of Keeman and was given full and sole control over partnership affairs pursuant to Article VII of the partnership agreement which provided, in part, as follows: ARTICLE VII MANAGEMENT
Pernie Bailey Drilling Company shall be Managing Partner and shall exercise full and sole control over the conduct of the partnership business. The Managing Partner may engage in any activity on behalf of the partnership *426 for the improvement, preservation , or protection of property and the success and welfare of the partnership. * * *
Under the rig management agreement, Pernie Bailey agreed to manage Rig 21 for Keeman for a 6-month period beginning December 15, 1980, and continuing for successive 6-month terms unless the agreement was terminated by either party upon 30 days written notice. The management agreement provided generally that Pernie Bailey was to collect all receipts attributable to the operation of Rig 21, deduct from the receipts all costs of operating the rig, and remit to Keeman remaining net profits, if any. Pernie Bailey was given 3 months to collect receipts attributable to the operation of Rig 21, and Pernie Bailey agreed to pay Keeman the amount of net profits within 3 months after the net profits were earned even if the related receipts had not been collected. Pernie Bailey agreed to pay Keeman interest at 12 percent per year on net profits not paid to the partnership within 10 days after they were due. In addition to reimbursing Pernie Bailey for all of its direct costs of operating the rig, Keeman agreed to pay Pernie Bailey a management fee of $ 500 each day the rig *427 was operated as reimbursement to Pernie Bailey for its overhead costs not directly chargeable to Rig 21. The Keeman Company's books and records were maintained on the accrual basis for tax purposes. Reflected below, for the periods indicated, are the accrued receipts and expenses relating to the operation of Rig 21, the accrued payments due Pernie Bailey on the promissory note, and the net accrued funds available for distribution to the partners of Keeman: Total
Dec. 15 -
Jan. 1 -
Dec. 15, 1980 -
Dec. 31, 1980
June 30, 1981
June 30, 1981
Accrued gross receipts
$  67,000.00
$  790,890.61
$ 857,890.61 Less:
Direct operating expenses
of Pernie Bailey
35,182.85
460,835.61
496,018.46 Management fee due
Pernie Bailey
8,000.00
90,500.00
98,500.00 Accrued net operating profit
23,817.15
239,555.00
263,372.15 Less:
Payments due to Pernie
Bailey on promissory note
--
238,311.90
238,311.90 Available for distribution to
partners of Keeman
$  23,817.15 [1]
$   1,243.10
$  25,060.25 *428 Accrued net operating profits, for the most part, were not paid by Pernie Bailey to Keeman on a timely basis, and payments due on the partnership's promissory note to Pernie Bailey were not paid timely. Pernie Bailey did not pay Keeman the net profits due for December 1980 until June 25, 1981. Also on June 25, 1981, Pernie Bailey paid Keeman a portion of the net profits due for the period January through June 1981. The balance of the net profits due Keeman for the January through June 1981 period was paid by Pernie Bailey on October 27, 1981. Pernie Bailey did not pay Keeman the 12-percent interest due on delinquent payments of net profits. The installments due on Keeman's promissory note to Pernie Bailey for January, February, March, and April 1981 were paid untimely on June 25, 1981. The installments for May and June 1981 were paid on June 29, 1981. Pernie Bailey was paid the $ 500 per day management fee with respect to Rig 21 for the period December 15 through December 31, 1980, in the total amount of $ 8,000 on June 29, 1981. The management fee for the period January 1 through June 30, 1981, in the amount of $ 90,500, was paid to Pernie Bailey on October 27, 1981. *429 4. Transfer of Assets of Keeman to Southland
On June 30, 1981, the partners of Keeman transferred the assets and liabilities of Keeman to Southland in exchange for 100 shares of the common stock of Southland in a nontaxable exchange under section 351. The 100 shares of Southland common stock were allocated among the partners of Keeman as follows: Number of
Partner
Shares Allocated
Pernie Bailey
10.000
The Washburn Company
19.825
William Washburn
17.545
Willis Duhon (petitioner)
17.544
O.D. Pharris
17.544
John Washburn
8.771
Lewis Merryman  8.771
Total
100.000
Southland agreed to assume the balance due on the promissory note payable to Pernie Bailey and to assume Keeman's responsibilities under the rig management agreement. The stated reason for the exchange of the partnership interests in Keeman for stock in Southland was to obtain the protection of limited liability afforded by corporate ownership of the drilling rig. Keeman never distributed any funds to its partners as partnership distributions, and the funds that were available for distribution were transferred to Southland in early 1982. Pernie Bailey continued to operate *430 Rig 21 until early 1983. Gross receipts, operating expenses, management fees, net profits, and note payments with respect to Rig 21 after its transfer to Southland, where disclosed in the record, are set forth below: Fiscal Year Ended
March 31, 1982*
March 31, 1983
Accrued gross receipts
$  2,096,818.27
$  531,404.18
Less:
Direct operating expenses
of Pernie Bailey
1,086,481.62
620,498.51
Management fee due
Pernie Bailey
--
--
Accrued net operating profit
--
--
Less:
Payments due to Pernie Bailey
on promissory note
476,623.80
--
Available for distribution
--
--
Pernie Bailey went into chapter 7 bankruptcy in 1986, after a long period of decline beginning in 1982. 5. Tax Returns
Keeman's Federal partnership income tax return for its short taxable year ending December 31, 1980, after interest and depreciation, reflected a net loss of $ 16,198.85 and an investment tax credit with respect to Rig 21 in *431 the amount of $ 225,000. Keeman's Federal partnership income tax return for its taxable year ending June 30, 1981, after interest and depreciation, reflected a net loss of $ 41,825. On their 1980 joint Federal income tax return, petitioners claimed an investment tax credit of $ 32,594 and a $ 2,842 loss relating to Mr. Duhon's interest in Keeman. Petitioners claimed $ 6,880 as an investment tax credit carryback to their 1977 return. OPINION 1. Tax Status of Keeman Company Partnership
As indicated above, the issue whether the Keeman Company partnership is to be disregarded for Federal income tax purposes was previously decided for respondent. Merryman v. Commissioner, 873 F.2d 879 (5th Cir. 1989), affg. T.C. Memo 1988-72. Lewis Merryman, one of the Keeman partners, was a party in that case. We note here, as in Merryman v. Commissioner, supra, the underlying transaction (namely, the operation of Rig 21 on a contract basis for unrelated oil and gas exploration and development companies) had economic substance and was entered into for profit. When the form chosen by a taxpayer for a transaction has no business *432 purpose, when the parties privy to the underlying transaction themselves disregard the form of the transaction, or when the form chosen serves no purpose other than the accretion of tax benefits, the form utilized by the parties may be disregarded. Commissioner v. Court Holding Co., 324 U.S. 331, 334, 89 L. Ed. 981, 65 S. Ct. 707 (1945); Gregory v. Helvering, 293 U.S. 465, 469-470, 79 L. Ed. 596, 55 S. Ct. 266 (1935); Packard v. Commissioner, 85 T.C. 397, 422 (1985); Cirelli v. Commissioner, 82 T.C. 335, 348 (1984). Also, when the form of a transaction (or a part thereof) represents merely one of a series of interrelated steps which, when viewed as a whole, do not justify giving tax recognition to the form chosen by the parties, such form may be disregarded, and the interrelated steps may be collapsed or recast to reflect more accurately the substance of the underlying transaction. Minnesota Tea Co. v. Helvering, 302 U.S. 609, 613, 82 L. Ed. 474, 58 S. Ct. 393 (1938); Redwing Carriers, Inc. v. Tomlinson, 399 F.2d 652, 658 (5th Cir. 1968); Penrod v. Commissioner, 88 T.C. 1415, 1428 (1987); Packard v. Commissioner, supra at 419-420. *433 In Merryman we concluded that the existence of Keeman must be disregarded for Federal income tax purposes. We reach the same conclusion based on the record here. Although Keeman purportedly was established for the ownership of a drilling rig, all of the operational responsibilities of owning Rig 21 were delegated to Pernie Bailey, a related corporation. All liabilities arising from the operation of the rig were assumed by Pernie Bailey, and Pernie Bailey was delegated all management responsibility for both the day-to-day operation of Rig 21 and for the internal business of the partnership (e.g., bookkeeping and payment of bills). In spite of the fact that the partnership was to purchase a piece of equipment for a stated purchase price of $ 2.25 million, the only capital invested in Keeman was $ 1,000 from Pernie Bailey. Even if Pernie Bailey's key employees provided this amount proportionate to their interest in Keeman, the contributions would have been minuscule in relation to the cost of Rig 21. The amount of capitalization was nominal apparently because the individual partners had no real financial risks associated with their interests in the partnership. As discussed, *434 all risks associated with the operation of Rig 21 were assumed by Pernie Bailey. Although the risk of financial losses nominally was to be borne by the partnership, in fact any real financial exposure was minimized, if not eliminated, by the lack of capital invested by the partners, by the financing of 100 percent of the "purchase price" of the rig by Pernie Bailey (the nominal seller), and by Pernie Bailey's role as managing partner of Keeman. These factors, taken together, effectively insulated the partners of Keeman from any of the financial risks borne by partners in a true, economically viable general partnership. As we noted in Merryman v. Commissioner, supra, events subsequent to the formation of Keeman corroborate our analysis. Payments due Keeman from Pernie Bailey and payments due from Keeman to Pernie Bailey were late. Interest due on late payments was ignored. What funds were available for distribution to the partners of Keeman (the stated objective for the existence of Keeman) were not so distributed but were transferred to Southland in early 1982. When the drilling business turned sour in 1983 and the rig became inactive, payments due on *435 the promissory note to Pernie Bailey apparently terminated with close to $ 2 million still due on the note. At trial, petitioner testified that late payments were normal in the industry. However, that does not convince us to disregard these events. Petitioners' witnesses testified about their risk as a result of having an interest in Keeman. For example, risks described in the testimony included: The Keeman partners were general partners; Pernie Bailey had overextended itself in buying two new rigs in 1980; Pernie Bailey may not have renewed the management contract for Rig 21, or stood behind its agreements with Keeman; O. D. Pharris may have died or left the Company; Bill Washburn may have been replaced by someone O. D. Pharris did not like; if there were a shortage of work, Bill Washburn may have dropped Rig 21 first; Rig 21 may have disappeared; there was no written understanding that Pernie Bailey would have forgiven the key employees' debt incurred in connection with formation of Keeman; and there may have been insufficient insurance for Rig 21 operations to fully insulate its partners from risk. We do not think the risks cited by petitioners' witnesses are significantly *436 different than those presented and considered in Merryman v. Commissioner, supra. The elements of risk described here were speculative. Many of the risks cited by petitioners are based on a theory that Pernie Bailey was financially unsound or unwilling to stand behind its key employees, or unduly dependent on O. D. Pharris for its success. These fears run contrary to other evidence that Pernie Bailey was highly successful during the relevant years, and that its key employees believed they would profit greatly from Rig 21 operations. It also makes the operation of Rig 21 for the benefit of Pernie Bailey's key employees seem undesirable; this is contrary to petitioner's view that the purpose was to retain key employees who were vital to Pernie Bailey's continued success. Petitioner's speculation about all these risks fails to convince us to disregard Pernie Bailey's agreement with Keeman in the rig management agreement to assume all risk of damage caused by its gross negligence or willful misconduct, and to indemnify Keeman for any and all liability arising from operation of the rig. Petitioner and Mr. Green testified that taxes were considered in establishing *437 Keeman, but the main consideration was retaining the key employees. We recognize that certain key employees of Pernie Bailey (that were not members of the Washburn family) theoretically stood to benefit from net profits of the partnership remaining after note payments had been made on the promissory note. However, they also stood to benefit from the significant tax benefits to be realized if the partnership is recognized for tax purposes. Petitioner also argues that under Louisiana law, an individual partner is liable for his share of the debts of the partnership. La. Civ. Code Ann. art. 2817 (West 1990). Moreover, agreements between partners as to their participation in partnership losses do not affect third persons. La. Civ. Code Ann. art. 2815 (West 1990). Petitioner further contends that, under Louisiana law, which governs the rig management agreement, indemnity contracts are strictly construed and will not be presumed to indemnify an indemnitee against the consequences of his own negligent acts. Doucet v. Gulf Oil Corp., 783 F.2d 518, 524-525 (5th Cir. 1986); Polozola v. Garlock, Inc., 343 So. 2d 1000, 1003 (La. 1977). Thus, petitioner *438 argues, Keeman bore the risks of loss resulting from claims for damages, other than those specifically resulting from the gross negligence or willful misconduct of Pernie Bailey. Accordingly, petitioner claims that Keeman acquired the benefits and burdens of ownership because it bore the risk of loss or damage to Rig 21. Harmston v. Commissioner, 61 T.C. 216, 231 (1973), affd. 528 F.2d 55 (9th Cir. 1976). We conclude that the operation of the provisions of Louisiana law do not change the result here. Keeman was established by Pernie Bailey as a benefit for several of its key personnel, at a time when there was a shortage of such personnel. Keeman was expected to play that role by all of those involved with it. Pernie Bailey in its agreement with the partnership undertook to indemnify the Keeman partners for any and all possible liabilities. None of the risks or burdens of partnership ownership realistically were placed on the Keeman partners. Other than William Washburn as an officer of Pernie Bailey, the other nominal partners in Keeman had little, if any, say in the activities of Keeman, how it was formed, or how it was terminated. In *439 effect, Keeman was merely a paper conduit operated by Pernie Bailey in such a manner that it was merely carrying on the corporate business of Pernie Bailey. Cirelli v. Commissioner, supra at 348. For Federal income tax purposes, Keeman must be ignored, and Pernie Bailey is to be regarded as owning Rig 21 during the year in issue. In summary, what was found by the Supreme Court in Gregory v. Helvering, supra, is similar to what we find here. Keeman was -- Simply an operation having no business or * * * [partnership] purpose -- a mere device which put on the form of [a partnership] * * *. No doubt, a new and valid [entity] was created. But that [entity] was nothing more than a contrivance * * *. It was brought into existence for no other purpose; it performed, as it was intended from the beginning it should perform, no other function. [293 U.S. at 469.]
Because we conclude that Keeman cannot be recognized for Federal income tax purposes, we need not address various alternative arguments raised by respondent. 2. Increased Interest under Section 6621(c)
Section 6621(c) (formerly section 6621(d)) *440 provides for an increase in the interest rate where there is a "substantial underpayment" (an underpayment of at least $ 1,000) in any taxable year "attributable to 1 or more tax motivated transactions." Because petitioners presented no evidence on this issue, we deem them to have conceded it. Accordingly, Decision will be entered for the respondent. Footnotes
1. These amounts apparently were not available for distribution until early 1982, after all accrued gross receipts were collected.↩
*. Southland's fiscal year ends on March 31.↩