WARREN B. SIEGAL AND ALEXANDRIA SIEGAL, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Siegal
Docket No. 8338-87
United States Tax Court
T.C. Memo 1992-334; 1992 Tax Ct. Memo LEXIS 355; 63 T.C.M. (CCH) 3127; June 10, 1992, Filed *355 Decision will be entered under Rule 155. Wayne A. Smith and Jane E. Gulde, for petitioners. S. Mark Barnes, for respondent. PARKER
PARKER
MEMORANDUM FINDINGS OF FACT AND OPINION PARKER, Judge: Respondent determined deficiencies in, and additions to, petitioners' Federal income taxes as follows: Additions to Tax
Year
Deficiency
Sec. 6653(a)(1)
Sec. 6653(a)(2)
Sec. 6661
1982
$ 19,605
$980  *
$ 4,901
1983
2,440
122
*
--  1984
29,083
1,454
*
7,208
Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years before the Court, and all Rule references are to the Tax Court Rules of Practice and Procedure. After concessions by both parties, [1] the issues remaining for decision are: (1) Whether petitioners' farm activity was an activity "not engaged in for profit" within the meaning of section 183(a), and, if so, the amount of any deductions otherwise permitted under section 183(b); (2) Whether petitioners' horse racing/breeding activity was an activity" not engaged in for profit" *356 within the meaning of section 183(a), and, if so, the amount of any deductions otherwise permitted under section 183(b); (3) Whether petitioners' condominium activity was an activity "not engaged in for profit" within the meaning of section 183(a), and, if so, the amount of any deductions otherwise permitted under section 183(b); (4) Whether petitioners have substantiated the amounts of certain deductions claimed in regard to the above three activities; (5) Whether petitioners are liable for negligence additions under section 6653(a)(1) and (2); and (6) Whether petitioners are liable for a substantial understatement of income tax under section 6661. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The Stipulation of Facts and the exhibits attached thereto are incorporated *357 herein by this reference. [2]
Petitioners, Warren B. Siegal and Alexandria Siegal, are husband and wife and resided in Tempe, Arizona, at the time their petition was filed in this case. The term petitioner in the singular will hereinafter refer to petitioner Warren B. Siegal. Since the age of 9, petitioner has been interested in agriculture and horses, having enjoyed visiting his uncle's farm and riding the horses on that farm. At an early age he expressed to his uncle his desire to own a farm, and his uncle counseled him to become a veterinarian so that he could afford a farm. Petitioner began college courses required for veterinary school, but discovered he did not do well in those courses. He did well in history and political science and pursued a liberal arts program *358 in college. He also discovered he was a rather good horseman and began participating in rodeos. He financed much of his undergraduate education by rodeoing. He rodeoed full-time for a couple of years after college. He then decided to go to law school and continued to rodeo during law school. After completing law school in 1970, he decided to devote his full time to rodeoing. He pursued the rodeo life for the next 3 years, and most of his close friends today are individuals he met during his days with the rodeo. In 1973 petitioner entered into the practice of law and got married. Mrs. Siegal had grown up on a large cattle ranch in Colorado and had always been interested in horses. However, because of a skiing accident during college, she could not comfortably ride horses anymore. During her courtship with petitioner, however, they spent a lot of time at racetracks and with people connected with horse racing. While petitioner does not particularly like practicing law, he has over the years developed a very financially successful practice in the field of personal injury cases. His net income from his legal practice has increased over the years as follows: Net Law Practice
Income Reported
Year
on Schedule C
1975
$26,323  1976
30,025
1977
25,499
1978
74,502
1979
24,144
1980
80,428
1981
46,889
1982
108,140
1983
45,286
1984
158,187
1985
120,000
1986
360,000
TOTAL
$ 1,099,423
*359 Petitioner would prefer to earn his living from farming and horse racing/breeding activities. As of the date of trial he had not abandoned his lucrative legal practice and did not suggest that he had any plans to do so in the foreseeable future. I. FARM ACTIVITY When petitioners were first married, they lived in an apartment for a couple of years. Early in their marriage they began searching for land close enough to Phoenix so that petitioner could easily service his law practice but far enough out that development would not overtake them in the foreseeable future. They found irrigated farmland available for sale for $ 2,000 to $ 2,500 per acre. Finally, in December of 1975, petitioners purchased 30 acres of land in Tempe, Arizona, for $ 154,000. The 30 acres comprised two parcels of about 15 acres each, separated by another parcel of land owned by someone else. One parcel was pastureland; the other parcel was a citrus grove that was in a very neglected and deteriorated condition. The land was located close to a freeway that went directly to downtown Phoenix and met petitioner's needs for a fast commute to his law office. The land had no city water or other city utilities *360 and was some 10 to 15 years away from development so as to meet petitioners' desire not to be overtaken by civilization too soon. However, from that time through the mid-1980's, the entire Phoenix, Arizona, area was rapidly developing and it was generally perceived that real estate was appreciating rapidly. The property purchased by petitioners still does not have city services such as water and sewer lines. The property also does not contain a house. Since April of 1976, petitioners have rented and lived in a house adjacent to their land. Apparently the land petitioners purchased had once been part of an operating farm, including a family residence. The land was split up and sold, but the farm family retained the residence for an aging grandmother. In addition to the two parcels of land of 15 acres each, petitioners also purchased another parcel of land where they intended to build their home. However, before petitioners commenced construction of a residence, the grandmother occupying the farm residence died, and that house became available. Since the owner wanted to keep the house in his family, petitioners were able to rent the house at a nominal rent and have lived there *361 ever since. [3] At the time of trial, petitioners were paying rent of $ 300 per month and had been assured by the owner that they could remain in the house indefinitely. Over the years petitioners have made some improvements to the farmhouse to make it more comfortable for them and their three sons. Petitioners want to rear their children in a farm environment. Before buying the farmland, petitioner inquired of a few persons as to the profit potential of the citrus grove. The citrus grove property was more expensive than irrigated farmland such as petitioners had been considering. Petitioner was told that if the Japanese fresh fruit market ever opened up to American producers, the citrus grove could be profitable. That has never happened, except possibly for one year. Generally, Japan has not opened up its fresh fruit market to United States *362 produce. Petitioner apparently did not investigate to determine the likelihood that the Japanese fresh fruit market would open up. Generally, the market for Arizona citrus is the juice market, which has lower prices than the fresh fruit (packed fruit) market. Generally, the citrus groves in Arizona have not been profitable to their owners for the last 25 years. However, fruit packers who buy fruit from many grove owners, pick it, and resell the fruit have made a profit some years. There are many government regulations regulating the fruit market, and there are no government subsidies for the fruit growers. As indicated above, the citrus grove was in a sadly neglected condition when petitioners purchased it. Petitioners and many of their personal friends worked very hard over the next 3 years to get the citrus grove in good condition, with the grass and weeds removed, the trees trimmed and pruned, and the irrigation ditches repaired. By 1979 the grove was in good condition. Since that time petitioners have maintained the citrus grove in excellent condition, and their citrus grove is among the finest in their area. The citrus trees are about 50 years old, but such trees, if *363 properly maintained, can live, and continue to bear fruit, indefinitely. Approximately 75 to 80 percent of the grove consists of Marsh white grapefruit trees. The balance of the grove contains three different types of orange trees whose fruit matures at different times and presents some problems of harvesting them in an economical fashion. As to sales of their fruit, petitioners' most profitable year was 1979, when they got good prices because there was a good market for fresh fruit. That year petitioners received gross income of $ 7,567 from the sale of their fruit. However, since 1979 the market in Arizona, particularly for Marsh white grapefruit, has been a juice market and generally unprofitable to grove owners. Normally, petitioners' grapefruit is sold to a Mr. Summers and his son at a flat rate of $ 10 to $ 20 per bin, and petitioners' grove produces about 200 bins of grapefruit per year. [4] In other words, Mr. Summers generally pays petitioners some $ 2,000 to $ 4,000 for the crop, picks it, and resells the fruit. When the fruit is picked by the local Sunkist Cooperative, the price received by petitioners depends upon expenses incurred, and may even result in an out-of-pocket *364 loss, as occurred one year. In addition to sales of fruit, petitioners sold some hay and obtained some grazing fees from the other 15-acre tract. The best year for hay was also 1979, when petitioners received $ 2,450 for their hay. The gross income from hay sales declined thereafter down to $ 592 in 1982. That was the last year that petitioners sold hay or obtained grazing fees from the pastureland. Also petitioners have at times received minor amounts of gross farm income from other sources. *365 Petitioners reported gross farm income over the years from the following sources and in the following amounts: [5]
*366 GROSS FARM INCOME
COOPERATIVE
PATRONAGE
YEAR
FRUIT
LIVESTOCK
HAY
DIVIDENDS
1976
$ 720
($ 384)
$ 0
$ 0
1977
808
169 29
0
1978
1,069
491 1,140
93
[1] 1979
7,567
(1,188)
2,450
38
[2] 1980
0
(350)
851
55
[3] 1981
2,579
0 712
429
[4] 1982
1,928
0 592
80
1983
396
0 0
400
1984
1,318
0 0
39
1985
4,129
0 0
312
1986
1,993
0 0
30
On their tax returns for the years 1976 through 1986, petitioners reported total gross income, expenses, and farm losses from the citrus grove and pastureland as follows: FARM LOSSES
EXPENSES
GROSS FARM
(INCLUDING
NET FARM
YEAR
INCOME
DEPRECIATION)
(LOSS)
1976
$ 336   $24,142 ($23,806) 1977
1,356
23,655
(22,299)  1978
2,793
25,863
(23,070)  1979
9,042
29,291
(20,249)  1980
944
29,371
(28,427)  1981
4,244
27,163
(22,919)  1982
3,610
31,844
(28,234)  1983
796
28,293
(27,497)  1984
1,357
31,615
(30,258)  1985
4,441
59,560
(55,119)  1986
2,023
95,679
(93,656)  TOTAL
$ 30,942
$406,476
($ 375,534)
*367 Over the years petitioners' actual out-of-pocket farm expenses have been rather modest except for mortgage interest payments. Petitioners performed most of the hard physical labor themselves and always tried to be as frugal as possible in their farm operations. The bulk of the expenses listed above was interest and depreciation. There is no evidence in the record to establish the proper cost allocable to the depreciable citrus trees as opposed to the nondepreciable land. [6]
*368 While petitioners maintained no formal books for their farm operation, they retained cancelled checks and receipts for their expenditures. They had a farm bank account, but did pay some bills with checks drawn on several other personal or law practice bank accounts. With some few exceptions, petitioners were able to substantiate most of the out-of-pocket expenses they deducted. See supra note 1 and schedules attached to Stipulation of Facts. The citrus grove was depreciated over a 10-year period ending in 1985. In 1985 and 1986 petitioners purchased several additional citrus groves. See supra note 6. Petitioners have never prepared a budget for their farm operations. Petitioners have never prepared any projections as to present or future profitability of their farm operation. Petitioners have a general impression that their land, along with all land in the Phoenix area, has appreciated greatly over the years. Petitioners would like to be able to make a living with agricultural and horse activities, and they still have that as their ultimate goal. [7]
*369 The net farm losses compared to petitioner's net law practice income were as follows: Year
Net Farm Losses
Net Law Practice Income
1976
($23,806) $30,025   1977
(22,299)  25,499
1978
(23,070)  74,502
1979
(20,249)  24,144
1980
(28,427)  80,428
1981
(22,919)  46,889
1982
(28,234)  108,140
1983
(27,497)  45,286
1984
(30,258)  158,187
1985
(55,119)  120,000
1986
(93,656)  360,000
TOTALS
($ 375,534)
$ 1,073,100
II. HORSE RACING/BREEDING ACTIVITY In 1975, 1976, and 1977 petitioner was still filing a Schedule C as a rodeo cowboy, reporting minor amounts of income, various expenses, and net losses. In 1977 petitioner and an old rodeo buddy, Ralph Maynard, jointly purchased three 2-year old thoroughbred race horses. They made the purchase on the recommendation of another old rodeo friend, Victor Karns, who had left the rodeo and become a full-time horse trainer. Petitioner and Maynard paid $ 2,500 for the three horses and sold two of them for $ 1,000 each. They retained Scott's Courtship, a colt, and raced him from 1977 through 1982. There is no persuasive evidence in the record as to the terms of any agreement between petitioner and *370 Maynard as to Scott's Courtship or any other horse. Scott's Courtship was sired by Doc Scott Jay, a thoroughbred that had good bloodlines but was never raced and was being used as a "teaser" in a horse-breeding operation but not as a stud. Earlier Doc Scott Jay had sired some winners, including one that won over $ 100,000, which is considered by horsemen a significant figure to establish a horse's reputation in racing. Scott's Courtship was raced as a 2-year old, his first race being a "claiming race" in which anyone can claim the horse by paying a certain set sum. Fortunately, he was not claimed, and his owners, petitioner and Maynard, were able to have him run in future horse races. Scott's Courtship was trained by Victor Karns (hereinafter Karns) and won 11 races during his racing career. He placed second in 12 races and placed third in 1 race. Scott's Courtship earned over $ 75,000 over his 6-year racing career, as follows: Year
Total Winnings
1977
$ 2,738
1978
27,967
1979
20,150
1980
11,921
1981
10,237
1982
2,611
TOTAL  $ 75,624
Petitioner reported net income from racing in only 1 year, $ 4,408 in 1978. There are discrepancies in the record between *371 what Scott's Courtship earned and what petitioners reported on their tax returns. [8]
In 1978 petitioners purchased for $ 30,000 a 2-1/2 acre parcel of land located on Tatum Boulevard north of Bell Road in Phoenix, Arizona (the Tatum Boulevard property). Karns lived on the Tatum Boulevard property in a trailer. Karns was always living from hand to mouth as a horse trainer, and petitioner had to co-sign on the loan to permit his friend to buy the trailer. Karns failed to make the payments on the trailer. Petitioner made virtually all of the payments on the trailer, and virtually every time petitioner saw Karns it cost petitioner money. His friend always needed money, and petitioner frequently gave him cash. Petitioner may have deducted *372 some of these trailer-loan payments and cash handouts as fees paid to Karns for training services. Karns did not bill petitioner for any training services performed on the Tatum property. He billed petitioner only for training sessions conducted at the racetrack. Petitioner maintained no records as to the amount of cash he gave Karns, the number of payments he made on Karns' trailer, or the total amount he paid Karns for training services. [9]
Horse training is a full-time job, and petitioner did not attempt to train Scott's Courtship or any other horse he has owned. Karns apparently did most of the training, including breaking horses to be ridden. Petitioners retained copies of newspaper articles, race cards, tout sheets, and photographs in regard to Scott's Courtship. They did not maintain any business records *373 as to their share of his winnings or as to the training expenses, the largest expense item for Scott's Courtship. Petitioners had other horses racing at various times, including Speedy Key, a colt they acquired in 1980 and raced from 1981 through 1985, and Lark's Spy, a mare they acquired in 1984 and raced through 1986. The records as to these and other horses are incomplete and fragmentary. Much of the testimony in regard to petitioners' horse activities pertains to events occurring in 1987 and 1988. Horse breeding is a full-time activity. It requires specialized equipment and facilities. Petitioners do not own the specialized equipment and facilities for a breeding operation. They own the Tatum Boulevard property, which has a ring and other training facilities, and the farm property where horses could perhaps be kept in the pasture and even in the citrus grove. The record does not establish that the pastureland and citrus grove were used in the horse activity during the years 1982 through 1984. [10]
*374 The record does not contain any persuasive evidence that petitioner had any plan for a horse-breeding activity during the years 1977 through at least 1982. [11]
In 1982 Scott's Courtship ran in 13 races and lost all of them. That ended his racing career. Efforts to use him for breeding purposes were unsuccessful in 1983 and 1984, although he may have bred two mares without any stud fee in 1984. In 1985 he may have been used to breed some mares without any stud fee. In the period 1982 through 1984, petitioners owned only one mare, Larks Spy, who was acquired in May 1984 and bred, but her foal died. Later she was successfully bred to Scott's Courtship, producing Scotty's Spy or Scottish Spy in 1985. Thereafter she could not be successfully rebred. In 1986 petitioners acquired a mare, Bobby Come On, who was raced for a while and then bred to Scott's Courtship. Before she foaled, she broke her leg and had to be put *375 down. Also in 1986 petitioners acquired five more mares for a total purchase price of $ 2,632. Petitioner acquired another mare, Speedy Weaver, but ran her in a claiming race and lost her to a claimant before she could be bred. In 1987 and 1988 Scott's Courtship was advertised for stud services at a fee of $ 350, which is a nominal fee. By the time of the trial, he had successfully produced a couple of offspring whose whereabouts were unknown to petitioner, and he had produced one offspring that had not yet raced, Scotty's Spy or Scottish Spy. In the 6 years after Scott's Courtship retired from racing, he had not been successful as a stud. He had not earned any stud fees. The record does not establish that petitioners owned or had any plans to acquire any other stud. For the years 1982 through 1984 the unsubstantiated deductions in connection with the horse activity related to depreciation and training. [12] The depreciation item involves a port-a-stall barn allegedly purchased from Karns. The other disputed substantiation issue involved training fees allegedly paid to Karns, as discussed above. *376 In 1982 petitioner purportedly purchased a port-a-stall barn from Karns for $ 20,000. Petitioner and Karns signed a typewritten document that recites that it is a purchase contract entered into the 5th day of January 1982 between "Warren Siegal, as purchaser, and Victor Karns, as buyer [sic]." The promissory note signed by petitioner recited that it was due upon demand and that the obligation bore interest of 10 percent per annum until paid. Petitioner admittedly made no payments on this alleged debt to Karns during the years before the Court. Karns did not testify at the trial. The record does not establish that there was a bona fide purchase or any bona fide debt, or that any payments have ever been made by petitioner. [13]
*377 There was no bank account for the horse activity, and petitioners maintained no formal books and records. The documentation as to purchases and sales of horses, as to the track record of horses, and later as to breeding records is incomplete and fragmentary. The official race records, the transfer records, and the certificates of foal registration in evidence are incomplete and fragmentary. For the years 1977 through 1980, petitioners reported the horse activity on a Schedule E as the Maynard-Siegal Partnership. No partnership returns were filed, and there is no information in the record as to the income and expenses from the horse activity in those years. On the Schedules E filed with their tax returns, petitioners reported the following net income or loss from the Maynard-Siegal Partnership: 1977
($ 1,505)
1978
4,408 1979
(383)
1980
(473)
For the years 1981 through 1986, petitioners reported the horse activity on a Schedule C separate from the farm Schedule F, as follows: Horse Losses
Expenses
Gross Horse
(Including
Net Horse
Year
Income
Depreciation)
Profit (Loss)
1981
$ 1,773
$ 2,040
($267)   1982
7,711
28,254
(20,543) 1983
0
17,260
(17,260) 1984
5,468
24,467
(18,999) 1985
9,203
16,591
(7,388)  1986
3,152
26,666
(23,514) *378 III. CONDOMINIUM In December of 1978 petitioner and J.C. Trujillo (Trujillo), an old rodeo buddy, jointly purchased a condominium located in Steamboat Springs, Colorado. They had become close friends during their rodeo days. [14] Trujillo needed a home for himself, his wife, and two daughters, but did not have the money or the credit to buy the condominium on his own. Petitioner helped his friend. The condominium cost $ 45,500. Petitioner and Trujillo each paid half of the down payment and were both liable on the mortgage. Trujillo and his family lived in the condominium from 1978 up to 1985, and during that period Trujillo *379 made the mortgage payments. He paid the mortgage payments directly to the bank. He did not pay any rent to petitioner except in the sense, and to the extent, that he paid petitioner's half of each monthly mortgage payment. Petitioner paid the taxes on the condominium while the Trujillo family lived there. The mortgage payments on the condominium were $ 333.68 per month from 1978 through December 21, 1983, and thereafter were $ 360.79 per month. On Schedule E of their tax returns for 1979 through 1984, petitioners reported income of $ 1,815 each year as rental income from the condominium. That amount of $ 1,815 does not equal one half of the mortgage payments that Trujillo paid each year. [15] On their Schedules E, petitioners also deducted, in addition to depreciation, the following rental expenses each year: 1979
$ 2,504
1980
3,070
1981
2,521
1982
2,310
1983
2,511
1984
2,465
Most of the expenses claimed were for interest and taxes. For the years before the Court the amounts of interest and taxes paid by or on behalf of petitioners have not been substantiated. *380 After 1985, when the Trujillo family moved out of the condominium, petitioners no longer reported the condominium as rental property. Petitioner and Trujillo tried to refinance or sell the property because Trujillo needed to get his equity out of the property. However, the appraised value of the property had declined, and they were not successful in their efforts. For the years 1978 through 1985, petitioners reported the following income, expenses, and net rental loss on Schedules E attached to their tax returns: CONDOMINIUM LOSSES EXPENSES (INCLUDING
YEAR
RENTAL INCOME
DEPRECIATION)
NET (LOSS)
1978
$ 0     $838   ($838)   1979
1,815
3,569
(1,754)  1980
1,815
4,135
(2,320)  1981
1,815
3,586
(1,771)  1982
1,815
3,375
(1,560)  1983
1,815
3,576
(1,761)  1984
1,815
3,530
(1,715)  1985
0
6,320
(6,320)  TOTAL $ 10,890
$ 28,929
($ 18,039)
There is no evidence in the record to support any of the above figures. No formal books and records were maintained for the farm activity, the horse activity, or the condominium activity. The accountant who prepared petitioners' tax returns did not prepare financial statements for them *381 or audit their financial records in any way. He simply took figures supplied to him by Mrs. Siegal, and placed those figures on the various forms and schedules. Respondent's statutory notice of deficiency disallowed the net loss claimed for each of the three activities each year. Those net losses and petitioner's net law practice income for the years before the Court were as follows: Net Law
Condominium
Practice
Year
Farm Activity
Horse Activity
Activity
Income 1982
($ 28,234)
($ 20,543)
($ 1,560)
$ 108,140
1983
(27,497) (17,260) (1,761) 45,286
1984
(30,258) (18,999) (1,715) 158,187
In addition to disallowing the net losses, respondent also determined additions to tax under section 6653(a)(1) and (2) and section 6661. OPINION The principal issue is whether petitioners' various activities were activities "not engaged in for profit" within the meaning of section 183(a). Section 183(a) provides that if an activity is not engaged in for profit, no deduction attributable to that activity is allowed except as otherwise provided by section 183(b). Section 183(b)(1) allows certain deductions (principally interest and taxes for the years *382 involved in this case) without regard to whether or not the activity was engaged in for profit. Section 183(b)(2) then allows other deductions but only to the extent of the gross income derived from the activity. Section 183(c) defines an activity not engaged in for profit as any activity other than one with respect to which deductions are allowable under section 162 or section 212. Whether deductions are allowable under section 162 or section 212 depends upon whether the taxpayer engaged in that activity with the "actual and honest objective of making a profit." Ronnen v. Commissioner, 90 T.C. 74, 91 (1988); Dreicer v. Commissioner, 78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). The taxpayer's expectation of profit need not be a reasonable one; however, the taxpayer must have a bona fide objective to make a profit. Hulter v. Commissioner, 91 T.C. 371, 393 (1988); Allen v. Commissioner, 72 T.C. 28, 33 (1979); Dunn v. Commissioner, 70 T.C. 715, 720 (1978), affd. without opinion 607 F.2d 995 (2d Cir. 1979), affd. on *383 another issue 615 F.2d 578 (2d Cir. 1980). Whether a taxpayer has the requisite actual and honest objective of making a profit is a question of fact to be resolved on the basis of all of the facts and circumstances of the particular case. Golanty v. Commissioner, 72 T.C. 411, 426 (1979), affd. without opinion 647 F.2d 170 (9th Cir. 1981); Dunn v. Commissioner, 70 T.C. at 720. The taxpayer bears the burden of proof on this issue. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933). In resolving this factual issue, greater weight is accorded to objective facts than to a taxpayer's mere statement of intent. Sec. 1.183-2(a), Income Tax Regs.; Thomas v. Commissioner, 84 T.C. 1244, 1269 (1985), affd. 792 F.2d 1256 (4th Cir. 1986); Dreicer v. Commissioner, supra, 78 T.C. at 645. Section 1.183-2(b), Income Tax Regs., sets out a nonexclusive list of nine objective factors relevant to the issue as to whether the taxpayer has the requisite actual and honest profit objective. [16] Not all of these factors are applicable in every case, and *384 no one factor is controlling. Sec. 1.183-2(b), Income Tax Regs.; see Abramson v. Commissioner, 86 T.C. 360, 371 (1986); Allen v. Commissioner, supra, 72 T.C. at 34. No one factor nor a majority of the factors is determinative, and we do not reach our decision by merely counting the factors that support each party's position. Dunn v. Commissioner, supra, 70 T.C. at 720. Accordingly, we will not walk through each of the nine factors as applied to each of the three activities in this case, particularly since our findings of fact are set out in some, but by no means exhaustive, detail. Instead we will briefly summarize the bases for our ultimate findings of fact that the farm activity was entered into and carried on with an actual and honest profit objective whereas the horse and condominium activities were not. *385 Farm Activity
Overarching this entire case is the specter of many years of increasing losses from the various activities. Petitioners sincerely love farm life, want to rear their children in a farm environment, and would like to earn their livelihood in agricultural and horse racing/breeding activities. The fact is petitioner husband's successful personal injury law practice provides their livelihood and makes it possible to finance their dreams. Petitioner husband, a longtime rodeo cowboy, financed his education and supported himself by rodeoing for many years. Even from childhood he wanted to own a farm or ranch. Wisely he obtained a college education and then a law degree. He deferred entering the practice of law for about as long as his body held up for the physical punishment of rodeoing. While he reluctantly entered the practice of law, he built up a very successful practice. Even before he achieved that financial success, he embarked on his dream and bought land, a deteriorated citrus grove and an overgrown pasture. There was no house on the land. Petitioners, particularly Mrs. Siegal, have worked extremely hard and have lived in a rental house all these years. *386 They still have not built the home they planned to build. Instead, they cleaned up and improved the deteriorated citrus grove and got it into good condition by 1979. That year also marks their peak year for income from sales of their citrus fruit. Thereafter petitioners continued to work hard to maintain the citrus grove, but have not been able to make it profitable. They have kept their out-of-pocket expenses as low as possible. Their largest expense has been their mortgage interest, which would have been deductible during those years without regard to profit objective. A big item accounting for losses was depreciation deductions. Petitioners' citrus grove is one of the finest in their area, but like other citrus growers in Arizona, petitioners have not been able to make a profit. In view of the number of years since their peak gross income year of 1979, petitioners' expectations of profit are unreasonable. Nonetheless the Court believes that petitioners have a bona fide objective that they are going to make it profitable. Citrus growers in Arizona have not made a profit in the last 20 to 25 years, and their hopes for doing so depend on whether or not the Japanese ever *387 open up their fresh fruit market to American producers. Therefore, petitioners are no more unrealistic than all of the other citrus growers in the area. The Court concludes that while petitioners' expectation of making a profit was unreasonable, they had the requisite actual and honest objective to make a profit from the farm activity, at least through the years before the Court, 1982 through 1984. [17]
*388 Horse Activity
Petitioners' horse activity, however, is another matter. Most of petitioners' friends are people from petitioner husband's rodeo days. During their courtship petitioners spent a lot of time at the racetrack and with people connected with racing. They continued to do so through the years involved in this case. The horse activities have pleasurable aspects. These aspects, however, do not include riding since the horses are thoroughbreds and are not used for riding. However, personal pleasure or satisfaction is only a minor factor in the Court's conclusion. The principal factors are the continuing pattern of losses, and the unbusinesslike manner in which the activity was conducted. There was no separate bank account for the horse activity as there was for the farm. Their principal race horse, Scott's Courtship, was jointly owned with Ralph Maynard, an old rodeo friend. While petitioner husband and Maynard were allegedly partners and allegedly co-owned other horses, the record is singularly devoid of persuasive evidence as to the terms of the agreement or arrangement with Maynard. Petitioner's testimony that he and Maynard each claimed the income and *389 expenses of the particular horses each had in his possession in Arizona or New Mexico, respectively, was unpersuasive. The nature of petitioners' ownership interest in the horses is not established by the record. This informal shifting of income and expenses, if it occurred at all, was unbusinesslike. Moreover, petitioner husband's dealings with Victor Karns, a horse trainer and another old friend from his rodeo days, were unbusinesslike. Training was a major expense of the horse operation, yet records of such expenses were nonexistent. The horse activity seemed more designed to provide a living and a place to live for an old buddy than to produce a profit. Petitioner testified that Karns was his "inspiration and guiding light." However, as a horse trainer Karns always lived from hand to mouth and always needed money. Petitioner frequently gave him cash. Karns lived in a trailer on petitioners' Tatum Boulevard property. Petitioner co-signed on the loan so Karns could acquire the trailer. Petitioner made virtually all of the payments on the trailer. Petitioner kept no records of the amount of cash he gave Karns, of the amount of payments he made on the trailer, or of the *390 amounts he paid Karns for whatever training services were actually rendered. Petitioner also allegedly purchased a port-a-stall barn from Karns, for which he made no payments to Karns but claimed depreciation deductions for the years before the Court. The documentation as to purchases and sales of horses, as to track records of horses, and later as to breeding records is incomplete and fragmentary. The official race records, the horse transfer records, and the certificates of foal registration in evidence are incomplete and fragmentary. The documents in evidence include photographs, race sheets, and newspaper articles and are more akin to souvenirs than to business records. The lack of documentation, the casual manner in which petitioner carried on the horse activity, the absence of any bank account for the horse activity, the absence of other records for the horse activity, and his unbusinesslike dealings with Karns persuade the Court that the horse racing/breeding activity was not engaged in for profit. Petitioner no doubt would have been happy if he had made money, but the Court is satisfied he would have carried on the same activities for personal satisfaction and pleasure *391 without regard to the absence of profit. For these reasons the Court concludes that petitioners did not have an actual and honest objective of making a profit from their horse activities for the years 1982 through 1984. Petitioners of course would be happy if they made money from the horses, and petitioners would like to earn their living from agriculture and horses. At the time of trial, petitioner husband had not abandoned his lucrative law practice and had no plans to do so in the foreseeable future. Again the Court expresses no view as to petitioners' profit objective in subsequent years not before the Court. What had been an expensive pleasure subsidized by the successful law practice could perhaps develop into an activity carried on with an actual and honest profit objective. However, the record does not show that to be the case in the years 1982 through 1984. Condominium
As to the condominium activity, this was another example of petitioner's helping an old rodeo buddy, J. C. Trujillo. Trujillo needed a home for his family but did not have the money or the credit to buy one. He and petitioner jointly purchased the condominium, with each paying one-half of the *392 down payment. Trujillo paid the mortgage payments from 1978 through 1985 while he and his family lived in the condominium. When Trujillo moved out, he and petitioner tried to sell or refinance the condominium because Trujillo needed money, but they were unsuccessful. This activity was to accommodate a friend and was not entered into or carried on in a businesslike manner. While petitioner realized "rental" income in the sense, and to the extent, that Trujillo paid petitioner's half of the mortgage payment each month, petitioner did not report one-half of the actual mortgage payments. He reported instead an unexplained amount of $ 1,815 as rental income each year. See supra note 15. There is no evidence in the record to establish the fair rental value of that condominium or to substantiate any of the rental expenses petitioner deducted. In particular, the record does not show the amount of mortgage interest and taxes paid by or on behalf of petitioner each year or the deductible portion attributable to his half interest in the property. Such items normally are easily ascertainable, and the failure to substantiate such basic items again demonstrates the unbusinesslike manner *393 in which this activity was carried on. On this record the Court cannot find that petitioner had an actual and honest objective of making a profit on the condominium. Substantiation
Most of the substantiation issues have either been conceded or warrant no further discussion of the facts as found. See supra notes 1, 9, 12, 13. One item merits brief mention -- depreciation of the citrus trees. Since the citrus trees have an indefinite productive life, the record suggesting up to 200 years, one might question whether any depreciation should be allowed. However, neither party has raised an issue as to the useful life of the trees, and the Court will not address it. Respondent challenges the basis allocable to the trees as opposed to the nondepreciable land. There is no evidence to support the basis petitioners allocated to the trees -- either $ 104,000 of the total $ 154,000 farm purchase price or $ 93,600. See supra note 6. However, at the time petitioners purchased the farm, they found other comparable irrigated farmland (without citrus groves) selling for $ 2,000 to $ 2,500. Accordingly, the Court concludes that $ 75,000 ($ 2,500 x 30 acres) of the purchase *394 price should be allocated to land and the balance ($ 79,000) to the citrus trees. Additions to Tax
Respondent determined additions to tax under section 6653(a)(1) and (2) and section 6661. Section 6653(a)(1) imposes an addition to tax if any part of any underpayment is due to negligence or intentional disregard of rules or regulations. Section 6653(a)(2) imposes a further addition of 50 percent of the interest payable on the portion of the underpayment attributable to negligence or intentional disregard of rules or regulations. Negligence is the lack of due care or failure to do what a reasonable and ordinarily prudent individual would do under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). Respondent's determination is presumed to be correct and petitioners have the burden to show error in the determination. Rule 142(a); Luman v. Commissioner, 79 T.C. 846, 860-861 (1982). Petitioners have carried their burden as to the farm activity but not as to the horse racing/breeding activity and the condominium activity. The Findings of Fact and the discussion of the section 183 issues above, while directed to whether *395 petitioners had an actual and honest profit objective, also persuade the Court that petitioners were negligent and disregarded rules or regulations in claiming those activities as business activities. While the issue was close, the Court concluded that petitioners had an actual and honest profit objective in regard to the farm. The Court cannot make such a finding in regard to the horse activity or the condominium activity. The failure to maintain proper records as to the horses and the condominium and the unbusinesslike dealings with old rodeo buddies compel a finding of negligence. [18] At least for the years involved in this case, the Court concludes that petitioner was taking care of his old friend and mentor, Karns, more than running a business. And the handling of the condominium was another instance of helping out an old friend. Of course, helping a friend and having an investment motive are not mutually inconsistent. However, the unbusinesslike way in which petitioner handled the alleged income and expenses of the condominium convinces the Court that it was not an activity entered into or carried on with an actual and honest profit objective, and that petitioner was negligent *396 in that regard. Similarly, for the additions to tax under section 6661, petitioners are liable for any substantial understatement of their income tax as to any underpayment attributable to such understatement of income as to the horse activity and the condominium activity. An understatement is "substantial" if it exceeds 10 percent of the amount of tax required to be shown on the return for the taxable year or $ 5,000, whichever is greater. Sec. 6661(b)(1)(A). The mathematical computations under section 6661(b)(1)(A) will be made in the Rule 155 proceedings and possibly the definitional amount for a substantial *397 understatement will not be found for 1983. Petitioners do not meet either of the requirements for a reduction under section 6661(b)(2)(B)(i) and (ii). There is no substantial authority supporting petitioners' treatment of the horse activity and condominium activity, and the mere fact that these activities were reported on a Schedule C and Schedule E, respectively, does not constitute adequate disclosure. Schirmer v. Commissioner, 89 T.C. 277, 284-286 (1987). [19] See also Antonides v. Commissioner, 91 T.C. 686, 701-704 (1988), affd. 893 F.2d 656 (4th Cir. 1990). To reflect the concessions and the above holdings, Decision will be entered under Rule 155. Footnotes
*. 50 percent of the interest due on $ 19,605, $ 2,440, and $ 28,831 for the years 1982, 1983, and 1984, respectively.↩
1. Some of the concessions are set out in the parties' Stipulation of Facts. Petitioners have made additional concessions in their post-trial briefs. These concessions will be taken into account in the Rule 155 computations.↩
2. Petitioners reserved relevancy objections to certain exhibits attached to the Stipulation of Facts, principally their tax returns for years before and after the years involved in this case. The Court has overruled those relevancy objections.↩
3. Petitioner testified that at one point he voluntarily raised his rent because the rental amount he had been paying was not sufficient to pay the taxes on the farmhouse.↩
4. Petitioners' three types of oranges are also sold primarily for juice. The three types of oranges are Arizona Sweet, Navel, and Valencias. The Valencias are a late crop, and sometimes the pickers do not want to be bothered with harvesting them. One year Mr. Summers failed to show up to pick any of the fruit, both grapefruit and oranges. Petitioners had to hire someone to pick the fruit and drop it on the ground, because some of the fruit will not drop off, and leaving old fruit on the trees would damage the next crop.↩
5. Petitioners object to the use of the data from the 1985 and 1986 tax returns, asserting that those returns are not in evidence. Petitioners are in error. Those returns, like the returns for the other years, are exhibits attached to the parties' Stipulation of Facts. Under Rule 91(c), the documents become part of the evidentiary record when the stipulation is filed with the Court. Respondent did not have to offer them into evidence, as petitioners argue. Moreover, petitioners' only objection to the returns was relevance, which the Court overruled. In a case involving profit objective under sections 162, 212, and 183, a pattern of losses over a long period of years is an important factor for the Court to consider. Also, petitioners object to many of respondent's requested findings based on data from the tax returns, asserting that tax returns are not self-proving. It is well established that, although tax returns are signed under penalty of perjury, the statements and figures on the tax return merely represent the taxpayer's claim and do not establish the truth or correctness of those statements and figures. Wilkinson v. Commissioner, 71 T.C. 633, 639 (1979); Roberts v. Commissioner, 62 T.C. 834, 837 (1974); Seaboard Commercial Corp. v. Commissioner, 28 T.C. 1034, 1051↩ (1957). However, the tax returns are proof of what the taxpayer reported or claimed and can be treated as admissions by the taxpayer.
1. Also $ 175 from "Grazing". ↩
2. Also $ 388 from "Grazing". ↩
3. Also $ 474 from "Grazing" and $ 50 from "Honey". ↩
4. Also $ 1,010 from "Grazing".↩
6. Petitioners initially allocated $ 104,000 of the $ 154,000 purchase price of the two parcels to the citrus trees and only $ 50,000 to the land. Petitioners claimed depreciation of $ 10,400 in 1976. Thereafter they reported the cost of the citrus trees as $ 93,600 and claimed depreciation of $ 9,360 each year from 1977 through 1985, at which time the cost allocated to the citrus grove had been fully depreciated. There is no evidence in the record to support either the $ 104,000 or the $ 93,600 allocation of cost for depreciation purposes. In 1985 and 1986 petitioners purchased additional citrus groves, and the amount of depreciation deductions claimed those years rose to $ 38,789 and $ 41,830, respectively.↩
7. At trial and on brief petitioners argued that the farm activity and the horse racing/breeding activity was a single integrated operation. On the basis of the record as a whole, the Court rejects that argument as a mere afterthought. Throughout the 11-year period, petitioners reported the farm activity on a Schedule F. The horse activities were always reported separately and in various different ways, on Schedules E and Schedules C. The various horse activities were never as well documented and were conducted in a far more casual and unbusinesslike manner than the farm operation.↩
8. For example, the computer printout in the record shows that Scott's Courtship won $ 10,237 in 1981. Petitioners' 1981 Schedule C for the horse activity reported total gross receipts of only $ 1,773. Petitioners did report gambling winnings from the racetrack of $ 1,644 that year.↩
9. However, for the years before the Court, the parties have now stipulated to certain amounts for training in 1982 and 1984. The entire amount of $ 9,125 for 1983 is disputed and remains unsubstantiated.↩
10. Petitioner, in arguing that he operated a single farming/horse racing/horse breeding activity, suggested that the citrus grove was a good place for the mares and their foals because of the shade and that the horses could graze in the pastureland. In 1982 petitioner reported fees from grazing in the amount of $ 1,010, but there is no indication that he owned any horses that grazed in the pastureland during the years 1982 through 1984. Also, there is no indication that any mares and their foals were in the citrus grove during those years.↩
11. The Court simply did not believe petitioner's self-serving testimony about any alleged plan.↩
12. The $ 524.74 expenditure in 1982 for conditioner, a horse feed supplement, has been adequately substantiated.↩
13. Petitioner testified that he later made payments to Karns and that the balance still due on the note was $ 17,000. Petitioner could not remember when he made the payments and he had no records of any such payments. The Court simply did not believe petitioner's testimony. Karns was always in need of money. Petitioner frequently gave Karns cash and paid virtually all of the payments on his trailer. It is incredible that petitioner would pay the payments on Karns' trailer and constantly give Karns cash handouts but fail to pay a debt he owed him. The Court is satisfied that there was no bona fide sale or debt between petitioner and Karns.↩
14. Trujillo made a career out of rodeo, and became a world champion in 1981, but was always financially strapped. Early on petitioner had recognized that he did not want to end up in that condition, and candidly admitted that "Maybe, if I'd rode a little better, I'd be where he is. But he rode better, so he made a career out of [rodeo] and I didn't ride quite as good, so I went to school."↩
15. Both petitioner and Trujillo testified that Trujillo made all of the mortgage payments while he and his family lived in the condominium. Petitioners insist that all required payments were made. However, the monthly payments of $ 333.68 would amount to a total annual payment of $ 4,004.16, of which the one-half paid on petitioner's behalf would have been $ 2,002.08. Similarly, when the mortgage payments were increased to $ 360.79 per month, the one-half paid on petitioner's behalf would have been $ 2,164.74 each year. Also the bank's payment record indicates that Trujillo did not make all of the required payments. He made only 4 payments in 1980, 1 payment in 1981, 13 payments in 1982, and some 7 payments in 1983 before the promissory note was modified on December 21, 1983. The record does not reflect the number or total of mortgage payments actually paid in 1984.↩
16. These factors, derived from prior cases, are: (1) the manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that the assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, that are earned; (8) the financial status of the taxpayer; and (9) the elements of personal pleasure or recreation involved in the activity.↩
17. At some point petitioners may have to face reality and cannot expect the rest of the taxpayers to continue to subsidize their unrealistic dreams indefinitely. The Court notes that in subsequent years, 1985 and 1986, petitioners purchased several additional citrus groves. This could suggest some effort to achieve economies of scale or to become fruit packers like Mr. Summers who does earn his living picking his own groves and those of other citrus grove owners. Petitioners' plan for the subsequent years may have been simply to harvest a principal crop of hefty depreciation deductions to help them acquire more and more land in a then appreciating land market. The Court expresses no view as to petitioners' profit objective after 1984. The Court points out that any appreciation in petitioners' land was not attributable to the citrus operation but to the development potential of all land in close proximity to Phoenix, Arizona.↩
18. Petitioners also argue that the farm and horse activity should be treated as a single activity, but if the Court had considered those two as a combined activity, the Court would have found that the combined activity was not entered into or carried on with an actual and honest objective of making a profit and would have concluded that petitioners were liable for negligence in respect to the activity as a whole.↩
19. See also Edwards v. Commissioner, T.C. Memo. 1990-70; Gjesteby v. Commissioner, T.C. Memo. 1987-617↩.