T.C. Memo. 2001-266

UNITED STATES TAX COURT

VICTOR A. AND MARION W. PRIETO, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 12606-99.                    Filed October 4, 2001.

<u>Gregg M. Anderson</u> and <u>Richard W. Craigo</u>, for petitioners.

<u>Peter C. Rock</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

VASQUEZ, <u>Judge</u>:  Respondent determined the following

deficiencies in and penalties on petitioners' Federal income tax:

| Year | Deficiencies | Penalties Sec. 6662(a) |
|------|------|------|
| 1994 | $155,045 | $31,009 |
| 1995 | 152,790 | 30,558 |

All section references are to the Internal Revenue Code in effect

for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

After concessions,[1] the issues for decision are: (1) Whether petitioners' horse activity was an activity engaged in for profit; and (2) whether petitioners are liable for penalties pursuant to section 6662 for negligence.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts, the supplemental stipulation of facts, the stipulation of facts with respect to subsequent years, the stipulation of settled issues, and the attached exhibits are incorporated herein by this reference. At the time they filed the petition, Victor Prieto (Dr. Prieto) and Marion Prieto (Mrs. Prieto) resided in San Mateo, California.

## I.   Dr. Prieto's Medical Practice

Dr. Prieto is an orthopedic surgeon. Since 1984, Dr. Prieto has been in private practice. In 1984, the partnership of Jensen, Watson & Light (JWL) hired him at a salary of $65,000 per year. In 1986, Dr. Prieto made partner at JWL. At this time, his salary increased to between $130,000 and $150,000 per year.

Since 1988, Dr. Prieto has run his own successful medical practice in San Francisco, California. Mrs. Prieto also worked in her husband's medical practice. She spends a considerable

---

[1] Respondent concedes that sec. 469 is not applicable.

amount of time working in the medical practice. Dr. Prieto's medical practice employed Lori Sasaki as a bookkeeper.

From 1991 through 1998, petitioners had no substantial income-producing assets or any other substantial source of income other than Dr. Prieto's medical practice. Petitioners reported the following net profit from Dr. Prieto's Schedule C, Profit or Loss From Business, for his orthopedic medical practice:

| Year | Net Profit |
|------|-----------|
| 1991 | $456,451 |
| 1992 | 548,350 |
| 1993 | 586,073 |
| 1994 | 650,898 |
| 1995 | 695,620 |
| 1996 | 794,424 |
| 1997 | 636,523 |
| 1998 | 737,684 |
| Total | 5,106,023 |

From 1991 through 1998, the net profit of Dr. Prieto's medical practice averaged $638,253.

## II. The Horse Activity

### A. Background

From the age of 4 to 5, Mrs. Prieto rode horses on the farm where she lived. From the age of 16 to 18, Mrs. Prieto owned a horse that was an ex-barrel racer. None of these horses were show jumpers.

Since she was a teenager, Mrs. Prieto had wanted to be involved in the horse field. Mrs. Prieto always enjoyed horses

and had a strong interest in horses.  Dr. Prieto also enjoyed horses.

Petitioners have two children:  Jill and Claire.  Jill was born on April 17, 1980, and Claire was born on July 7, 1982.  As parents, petitioners were actively involved in their daughters' activities.  Some of the activities petitioners' daughters participated in included swimming and dancing.  Petitioners would organize dance troops, transport children to events, and arrange for obtaining uniforms.  In 1987, when Jill was 7 and Claire was 5, Jill and Claire began riding horses.

Whatever activity petitioners and their family got involved with they did it "110 percent".  Petitioners' daughters became interested in horses, so petitioners and their family got deeply involved with horses.  Jill and Claire's involvement with horses became a family event where Mrs. Prieto would often be ringside organizing lunches and dinners and Dr. Prieto would do his medical charts and watch Jill and Claire ride the horses.  As with swimming and dancing, petitioners' children became deeply involved with horseback riding.

By 1990, petitioners owned three ponies for their daughters to ride.  Prior to May 1, 1991, the date the activity in question commenced, Jill and Claire competed in horse shows.

Petitioners became interested in starting the horse activity because of the recreational riding and showing activities that

Claire and Jill had participated in since 1987. Prior to 1987, when Jill and Claire got involved with horses, Mrs. Prieto had no experience with show jumpers or showing horses. Petitioners told Jill and Claire if they wanted to participate in horseback riding and perhaps compete on a high level, then petitioners would start the horse activity.

B. Startup

Starting in May 1991, petitioners engaged in a horse activity under the name Fordham Farms that included purchasing, training, showing, and selling "hunter", "jumper", and "equitation" horses. None of the horses in the horse activity were held for breeding or bred.

"Hunter" is a category of horse competition that grades each horse on its form, style, and technique as the horse competes on a course of multiple hurdles. "Jumper" is a category of horse competition that grades the horse and rider on their ability to jump fences cleanly and quickly. The courses have tight turns and angled fences making the jumps more difficult than those in the hunter category. "Grand Prix Jumper" is a category of horse competition that also grades each horse on its ability to jump fences cleanly and quickly; however, the courses are of a higher difficulty than in the jumper category (higher fences, multiple hurdles, etc.). "Equitation" is a category of horse competition

that grades each <u>rider</u> on his form.  Petitioners' daughters mostly competed in equitation events.

Petitioners used the same ponies that their children rode for pleasure to start the horse activity.  At the start of the horse activity, petitioners purchased Welsh ponies for the horse activity.  They chose Welsh ponies because that was the type of horse their daughters were riding.

When they first started the horse activity, petitioners talked to veterinarians, trainers, and other owners and read periodicals about hunter and jumper horses.  Petitioners also owned books about ponies, hunters, and jumpers.  Petitioners attended seminars, clinics, and award banquets put on by horse organizations.

C.   <u>Employees Hired by Petitioners</u>

Around May 1991, petitioners hired Joe Norick to be the horse activity's trainer.  In the middle of 1993, petitioners hired Nicole Shahinian (Nicole) to ride their horses.  Shortly thereafter, petitioners decided to replace Mr. Norick with a new trainer.  One of the reasons petitioners decided to replace Mr. Norick was because Jill and Claire could not ride the horses petitioners owned.  Petitioners replaced Mr. Norick with Nicole.

At this time, Nicole was responsible for training the horses, giving their daughters lessons, and supervising all aspects of the horse activity (including supervising people

petitioners hired to clean the stalls and groom, braid, and feed the horses).  Nicole's background was as a "junior" rider;[2] she had no experience as a trainer or running a business.  At this time, Nicole had just turned 18 years old.

Petitioners hired other people besides Mr. Norick and Nicole to work in the horse activity.  Petitioners hired Scott Wilson as an assistant trainer, Bill Nissen as veterinarian, Ms. Sasaki as bookkeeper, Patrick Hurley as accountant for the horse activity,[3] and Carlos Soriano as a groom.  At horse shows, when the horse activity needed extra help, petitioners hired people to braid the horses, horseshoers, and a night watchman.

Petitioners sent the horse activity's records to Ms. Sasaki to sort the records into separate file folders, and each year petitioners received a box from Ms. Sasaki with the records sorted.  Ms. Sasaki also inputted the financial records of the horse activity onto a computer.  Petitioners reviewed the books and records of the horse activity and their tax returns.

D.   How Petitioners Conducted the Activity

Petitioners created a logo for the horse activity and had "business cards" and stationery that bore this logo.  Petitioners also used envelopes bearing the name Fordham Farms.

---

[2]   "Junior" refers to riders under 18 years old.

[3]   Petitioners had a separate accountant, Jay Witt, who prepared their individual income tax returns.

Petitioners did not have a written business plan or make a budget for the horse activity. Petitioners did not have bills of sale for every horse they owned. Some of the bills of sale for horses were in petitioners' names rather than the name of the horse activity. Petitioners insured only some of their horses. Petitioners would not force people to pay money owed to them. Jill and Claire advised petitioners which horses to purchase and sell.

The horse activity's opening balance sheet for 1994 listed several horses as assets that had been reported as sold, or as dying, in 1993. This opening balance sheet also listed "Cody Williams" as an asset. Cody Williams is not a horse; he is a person.

Petitioners placed an advertisement in a horse show program that pictured Jill and Claire riding horses, wished them good luck in 1995, and congratulated them on their 1994 equitation medals and participation in the Marshal-Sterling Children's Jumper League. Petitioners also placed one advertisement in a publication called "Horse's International".

Petitioners kept records called "business goals" for 1994 and 1995. Petitioners came up with these goals. These goals were informal ideas that petitioners hoped to implement. Some of the goals for 1994 were: (1) Leasing or selling "Make Believe", (2) selling "Fashion Page", (3) developing "Desire Me" and

selling it for either $75,000 as a "pre-green" or $125,000 to $150,000 as a "first year green hunter", and (4) selling "Rising Sun" for $35,000 to $40,000. Other goals were more general such as purchasing and developing a grand prix horse and a junior jumper, increasing the number of horses shown, and increasing the use of trucks to transport horses.

Petitioners did not sell Fashion Page in 1994. Petitioners did sell Make Believe, Desire Me, and Rising Sun in 1994. The sale price and petitioners' original purchase price of each of these horses was as follows:

| Horse | Purchase Price | Sale Price |
|-------|----------------|------------|
| Make Believe | $22,500 | $20,000 |
| Desire Me | 22,500 | 16,000 |
| Rising Sun | 1,000 | 1 |

Petitioners' goals for 1995 were more general than those for 1994. They included increasing hauling income, increasing their client base, developing their horses, purchasing junior jumper and equitation horses, getting their horses to the shows, and having Nicole stay on as their trainer.

E.    Boarding the Horses

The horses and all other items necessary for the horse activity were maintained at the following locations (all located in California):

| Dates | Boarding Facility | Location |
|---|---|---|
| 5/91 - 12/93 | Portola Valley Training Center | Portola Valley |
| 1/94 - 4/95 | Pebble Beach Equestrian Center | Pebble Beach |
| 4/95 - 8/95 | Portola Valley Training Center | Portola Valley |
| 8/95 - 12/95 | Hidden Valley Ranch | Hidden Valley |

The boarding facility in Portola Valley was a 30-minute drive from petitioners' home in San Mateo, California. The boarding facility in Pebble Beach was a 1.5- to 2-hour drive from petitioners' home. Rather than drive to Pebble Beach, petitioners rented a house near Pebble Beach, California, where petitioners and their children would stay on weekends they visited the boarding facility.

Hidden Valley is in southern California and was not near petitioners home. Nicole recommended to petitioners that they move their horses from northern California to southern California. When petitioners moved their horses to southern California in August 1995, Nicole moved in with her then boyfriend (and future husband), who, at the time, lived in southern California.

F.  Expenses/Losses/AGI

The total entry fees and show costs reported by petitioners for the horse activity were as follows:

| Category | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 |
|---|---|---|---|---|---|---|---|---|
| Entry fees | $21,831 | $37,396 | $79,240 | $49,057 | $56,168 | $882 | $91,656 | $66,471 |
| Show costs | 4,065 | 22,792 | 20,991 | 21,978 | 28,030 | 0 | 0 | 0 |
| Reimbursements | (0) | (22,820) | (43,851) | (30,417) | (0) | (0) | (0) | (0) |
| Total | 25,896 | 37,368 | 56,380 | 40,618 | 84,198 | 882 | 91,656 | 66,471 |

Excluding 1996, the average yearly entry fee and show cost expense of the horse activity was $57,512.

During the years in issue, petitioners showed the horses they owned at least 46 times. In 1996, petitioners' horses that were "serviceable" were "in the ring" at shows petitioners attended. In 1996, petitioners' horse named "Fran's Guy" was in the ring at horse shows one to two times per show attended and was in the ring at least 30 times over the course of the year. This meant that during 1996 petitioners entered their horses in at least 15 shows.

Petitioners reported the following ordinary income and losses from the horse activity:

| Year | Ordinary Income/(Loss) |
|------|------------------------|
| 1991 | ($147,118) |
| 1992 | (366,350) |
| 1993 | (427,947) |
| 1994 | (373,694) |
| 1995 | (361,854) |
| 1996 | 13,703 |
| 1997 | (455,624) |
| 1998 | (437,051) |

Petitioners incurred $1,676,963 of losses through 1995 and $2,555,935 of losses through 1998. During these years, the loss from the horse activity averaged $319,492. Excluding 1996, the losses averaged $367,091.

Petitioners reported the following adjusted gross income (AGI):

| Year | AGI |
|------|-----|
| 1991 | $343,212 |
| 1992 | 235,390 |
| 1993 | 181,237 |
| 1994 | 290,909 |
| 1995 | 293,567 |
| 1996 | 785,116 |
| 1997 | 157,006 |
| 1998 | 245,474 |

After excluding the losses (and ordinary income) reported by the horse activity, petitioners' "readjusted" AGI is as follows:

| Year | Readjusted AGI |
|------|----------------|
| 1991 | $490,330 |
| 1992 | 601,740 |
| 1993 | 609,184 |
| 1994 | 664,603 |
| 1995 | 665,421 |
| 1996 | 771,413 |
| 1997 | 612,630 |
| 1998 | 682,525 |

From 1991 through 1998, petitioners' readjusted AGI averaged $635,981.

G.   Petitioners "Attempts" To Cut Costs

During the years in issue, petitioners spoke with Nicole about cutting the horse activity's costs and increasing its income.  Petitioners, however, only discussed with Nicole the fact that the horse activity was losing money; petitioners never informed Nicole of the amount of the losses (which totaled hundreds of thousands of dollars).

H.    Personal Nature of Activity/Elements of Pleasure

During the years in issue, petitioners and their children spent almost every weekend with the horses.  Dr. Prieto, Mrs. Prieto, Jill, and Claire used the weekends spent with the horses as their time to unwind.  Jill and Claire would ride and take lessons on the horses.  Jill and Claire enjoyed riding horses.  Mrs. Prieto also rode the horses.  In addition to watching their daughters compete at the horse shows, petitioners attended hospitality tents located at the horse shows.

In January 1994, petitioners sold a horse named "Browning".  In a letter thanking the purchaser of Browning for buying the horse, petitioners wrote that they would be using the money from this transaction to purchase a quality junior jumper for their daughter Jill.

Dr. Prieto only did "simple" tasks for the horse activity.  He felt that his college and medical education entitled him not to muck[4] the stalls.

During the years in issue, Mrs. Prieto, Claire, and Jill were members of the following horse organizations:  The American Horse Shows Association, the Pacific Horse Show Association, the California Professional Horsemen's Association, the United States Equestrian Team, and the NorCal Hunter Jumper Association.  In

---

[4]  To "muck" means "to clear of manure or filth".  Merriam Webster's Collegiate Dictionary 762 (10th ed. 1996).

order for Claire and Jill to compete in horse shows, they had to be members of these organizations.

I.    Source of Money for the Activity

Initially, petitioners had a sufficient amount in savings accumulated to fund the startup of the horse activity.  At times, however, the horse activity had cash shortages, and petitioners needed extra money to purchase horses.  On these occasions, petitioners borrowed money from Dr. Prieto's medical practice line of credit and transferred funds out of the medical practice bank accounts to provide working capital for the horse activity.

J.    End of the Activity

As of October 2000, petitioners were closing up the horse activity.  At that time, Jill was 20 and was in Belgium (since February 2000) working with horses, and Claire was 18.

OPINION

The Horse Activity

Section 183(a) provides generally that, if an activity is not engaged in for profit, no deduction attributable to such activity shall be allowed except as provided in section 183(b). Section 183(c) defines an "activity not engaged in for profit" as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212."

The U.S. Court of Appeals for the Ninth Circuit, to which an

appeal in this case would lie, has held that for a deduction to be allowed under section 162 or section 212(1) or (2), a taxpayer must establish that he engaged in the activity with the primary, predominant, or principal purpose and intent of realizing an economic profit independent of tax savings. See Wolf v. Commissioner, 4 F.3d 709, 713 (9th Cir. 1993), affg. T.C. Memo. 1991-212; Indep. Elec. Supply, Inc. v. Commissioner, 781 F.2d 724, 726 (9th Cir. 1986), affg. Lahr v. Commissioner, T.C. Memo. 1984-472.

The expectation of profit need not have been reasonable, but it must be bona fide. See Golanty v. Commissioner, 72 T.C. 411, 426 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981); sec. 1.183-2(a), Income Tax Regs. Whether the requisite profit objective exists is determined by looking to all the surrounding facts and circumstances. Golanty v. Commissioner, supra at 426; sec. 1.183-2(b), Income Tax Regs. Greater weight is given to objective facts than to a taxpayer's mere after-the-fact statement of intent. Indep. Elec. Supply, Inc. v. Commissioner, supra; Thomas v. Commissioner, 84 T.C. 1244, 1269 (1985), affd. 792 F.2d 1256 (4th Cir. 1986); sec. 1.183-2(a), Income Tax Regs. Petitioners bear the burden of proof. Rule 142(a).[5]

---

[5] Cf. sec. 7491(a), effective for court proceedings arising in connection with examinations commencing after July 22, 1998.
(continued...)

Section 1.183-2(b), Income Tax Regs., provides a list of factors to be considered in the evaluation of a taxpayer's profit objective: (1) The manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisers; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or loss with respect to the activity; (7) the amount of occasional profits, if any, from the activity; (8) the financial status of the taxpayer; and (9) elements of personal pleasure or recreation. This list is nonexclusive, and the number of factors for or against the taxpayer is not necessarily determinative but rather all facts and circumstances must be taken into account, and more weight may be given to some factors than to others. See sec. 1.183-2(b), Income Tax Regs.; cf. Dunn v. Commissioner, 70 T.C. 715, 720 (1978), affd. 615 F.2d 578 (2d Cir. 1980).

The evidence submitted to the Court establishes that petitioners' primary, predominant, or principal motive for engaging in the horse activity was not for profit.

---

[5](...continued)
Petitioners do not contend that their examination began after July 22, 1998, or that sec. 7491 is applicable to their case.

A.    Manner in Which the Activity Is Conducted

Petitioners hired professionals to keep books and records and to prepare their returns.  They also hired professionals to work in the horse activity as grooms, braiders, horseshoers, and veterinarian.  While these facts weigh in petitioners favor, they are not the only facts presented to the Court.

While petitioners did keep records, they did not have bills of sale for all their horses, and the records appear to be faulty.  Dr. Prieto could not explain why the show costs and entry fees were so low for 1996.  Mrs. Prieto testified that they understated the horse activity's show costs for 1996.  We agree.[6]

Even though they had records reporting substantial losses, petitioners never developed a written business plan or made a budget.  Dr. and Mrs. Prieto testified that the "business plan" of the horse activity was to buy, train (develop), show, and sell horses.  This is not a plan; this is merely a statement of what the horse activity did.  While petitioners wrote out "business goals" for 1994 and 1995, they never developed a plan to achieve these goals.

Petitioners claimed to have hired other riders, such as Annalee Bennet, to show the horses.  The horse show entry forms for 1994 and 1995 list only petitioners' daughters and Nicole as

_____

[6]  We note that the likely effect of this understatement was to create the appearance of a profit for the horse activity for 1996 when none in fact existed.

riders of petitioners' horses. Ms. Bennet was not called as a witness. We infer that her testimony would not have been favorable to petitioners. See Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947).

Petitioners did not attempt to collect debts owed to them. Additionally, when petitioners fired Mr. Norick, they replaced him with Nicole who was 18 years old at the time and, although she had been a junior rider, had no experience as a trainer or running a business. Furthermore, petitioners decided which horses to buy and sell based upon which horses their daughters wanted.

Petitioners further rely on the testimony of Russell Stewart to support the conclusion that they conducted the horse activity in a businesslike manner. Mr. Stewart was qualified as an expert in his knowledge of and in judging grand prix jumper, hunter, and equitation horses. Subsequent to the years in issue, Mr. Stewart rode petitioners' horses and transported petitioners' horses. He did not review petitioners' books and records. Furthermore, all the facts for Mr. Stewart's report were supplied by petitioners or their representatives.

The purpose of expert testimony is to assist the trier of fact to understand evidence that will determine the fact in issue. See Laureys v. Commissioner, 92 T.C. 101, 127-129 (1989).

We do not find Mr. Stewart's conclusory report to be of any assistance to the Court and accordingly disregard it.

On the whole, we conclude that this factor weighs against petitioners.

B.    Expertise of Petitioners and Their Advisers

Dr. Prieto had no significant experience with horses prior to starting the horse activity.  Mrs. Prieto's only experience with horses was riding them as a child and a teenager. Petitioners claimed to have talked with many professionals before entering the horse activity.  These conversations, however, mainly focused on the fact that a person could make a lot of money or lose a lot of money buying and selling horses. Petitioners did not discuss how to conduct the horse activity to make it profitable, how to train the horses, or how to manage the horse activity.  Other than being advised to "get a trainer", petitioners received no useful advice before beginning the horse activity.  This factor also weighs against petitioners.

C.    Time and Effort Expended by Petitioners

Mrs. Prieto claimed to work 40 hours a week, and Dr. Prieto claimed to work 20 to 30 hours a week, in the horse activity. Other than petitioners' self-serving, conclusory statements, there is no evidence to support this assertion.  Dr. Prieto is an orthopedic surgeon.  Mrs. Prieto works in his office and spends a considerable amount of time doing so.  According to Nicole,

during the workweek petitioners were not usually with the horses. Accordingly, we do not accept petitioners' testimony. See Wood v. Commissioner, 338 F.2d 602, 605 (9th Cir. 1964), affg. 41 T.C. 593 (1964); Tokarski v. Commissioner, 87 T.C. 74, 77 (1986). Accordingly, this factor also weighs against petitioners.

D.    The Activity's History of Income or Loss

A record of substantial losses over several years may be indicative of the absence of a profit motive. Golanty v. Commissioner, 72 T.C. at 426. As was noted by the Court on the record at trial, the losses are large enough to be described as substantial or huge. The only year petitioners did not report a loss is 1996. This appears to be due to the incorrect reporting of expenses for that year, and as we noted supra the likely effect of the understatement of expenses was to create the appearance of a profit for the horse activity when none in fact existed. Petitioners' losses from 1991 through 1998 averaged well over $300,000 per year.

Furthermore, petitioners' history of losses belies any notion that it was operated for profit. While a person may start out with a bona fide expectation of profit, even if it is unreasonable, there is a time when, in light of the recurring losses, the bona fides of that expectation must cease. See Filios v. Commissioner, 224 F.3d 16 (1st Cir. 2000), affg. T.C. Memo. 1999-92. This factor also weighs against petitioners.

E.   Petitioners' Financial Status

Substantial income from sources other than the activity in question, particularly if the activity's losses generate substantial tax benefits, may indicate that the activity is not engaged in for profit.  Sec. 1.183-2(b)(8), Income Tax Regs. From 1991 through 1998, petitioners' net profit from Dr. Prieto's medical practice averaged $638,253.  This factor weighs against petitioners.

F.   Elements of Personal Pleasure

The absence of personal pleasure or recreation relating to the activity in question may indicate the presence of a profit objective.  Sec. 1.183-2(b)(9), Income Tax Regs.  Petitioners and their children derived substantial amounts of pleasure from the horse activity.  Based on the facts of this case, we find that this factor weighs against petitioners.

G.   Additional Facts

The following additional facts also support our conclusion that the horse activity was not entered with the primary, predominant, or principal purpose of making a profit.  The evidence established that petitioners' daughters mainly rode the horses in equitation competitions.  Equitation competitions grade the rider and not the horse.  Dr. Prieto also testified that he went to the horse shows to watch his daughters compete.

Dr. Prieto testified that petitioners never purchased horses

for their children and that they never told anyone that the horses were for their children. His testimony, however, was impeached by a letter petitioners wrote in which they state that they were using money specifically to buy a horse for Jill. The fact that petitioners did not purchase horses in their daughters' names is unpersuasive.

Additionally, within months of Jill's leaving the country and Claire's turning 18 petitioners terminated the horse activity.

H.    Conclusion

After reviewing the entire record, we conclude that petitioners did not engage in the horse activity with the primary, predominant, or principal purpose and intent of making a profit within the meaning of section 183.

Section 6662 Penalty

Section 6662 imposes a penalty on an underpayment of tax required to be shown on a return. Section 6664(c)(1) provides that no penalty shall be imposed if it is shown that there was reasonable cause for the underpayment and that the taxpayer acted in good faith. The determination of whether a taxpayer acted with reasonable cause and in good faith depends upon the facts and circumstances. See sec. 1.6664-4(b)(1), Income Tax Regs. Reliance on the advice of an accountant may demonstrate reasonable cause and good faith. See id.

Respondent argues that petitioners' treatment of the horse activity's expenditures as business expenditures was negligent or an intentional disregard of rules or regulations. We conclude that petitioners reasonably and in good faith relied on their accountants to determine whether petitioners, as a legal matter, were entitled to deduct the horse activity's expenses.[7] Accordingly, petitioners are not liable for the accuracy-related penalties for 1994 and 1995.

In reaching all of our holdings herein, we have considered all arguments made by the parties, and to the extent not mentioned above, we find them to be irrelevant or without merit.

To reflect the foregoing,

<u>Decision will be entered under Rule 155</u>.

---

[7] Mr. Hurley, the accountant for the horse activity, specialized in preparing tax returns for people who operated horse activities. Petitioners gave him all the records prepared by the horse activity's bookkeeper and all the relevant facts so that Mr. Hurley could prepare the tax returns for the horse activity.