T.C. Memo. 2013-294

UNITED STATES TAX COURT

TRAVIS A. MATHIS AND BETTINA C. JARY-MATHIS, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 21704-10, 24596-11.          Filed December 30, 2013.

James Frederick Martens, Kelli H. Todd, and Jeffrey S. Taylor, for

petitioners.

Roberta L. Shumway and Bryan J. Dotson, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

GOEKE, Judge: Petitioners owned a cutting horse farm in Florence, Texas.

They continued to operate the farm despite sustaining significant losses for each of

the 13 years of its existence. Respondent audited petitioners' Forms 1040, U.S.

[*2] Individual Income Tax Return, for the years 2006 to 2008. Respondent determined petitioners were not operating the farm for profit. Consequently, they issued a notice of deficiency denying the related deductions and determining a deficiency for each of those years. Respondent also imposed accuracy-related penalties associated with the resulting deficiencies. The issues for decision are:

(1) whether petitioners engaged in their cutting horse activity from 2006 to 2008 for profit within the meaning of section 183(a).[1] We hold that they did not; and

(2) whether petitioners are liable for accuracy-related penalties under section 6662(a) for 2006, 2007, and 2008. We hold that they are not.

FINDINGS OF FACT

I. Petitioners

Petitioners resided in Texas when they filed the petition.

Bettina Jary-Mathis grew up in south Texas and spent much of her youth assisting her uncle on a cattle ranch. As a teenager she developed a passion for cutting horses. Cutting is an equestrian event in which judges score a horse and rider on their ability to isolate a cow or calf from a herd. When Mrs. Jary-Mathis

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[*3] was in high school, her father, who was an architect, designed a house on a cutting horse farm for one of his clients. While her father worked on the house, Mrs. Jary-Mathis hovered around the barn and learned all she could about cutting horses.

In 1992 Mrs. Jary-Mathis married Travis Mathis. Mr. Mathis comes from a wealthy family--his grandfather co-founded Brown & Root, a lucrative engineering and construction company. Petitioners earn millions of dollars in investment income every year.

## II. La Brisa Farm

In 1995 petitioners purchased property in Florence, Texas, and started La Brisa Farm to train cutting horses. From 1995 until 2000 Mrs. Jary-Mathis managed the farm primarily as a training operation. She bred her mares to high-quality stallions to produce horses capable of competing in the premier cutting events. She employed accomplished onsite trainers to develop her young horses' talent, but the prize money she earned did not cover the expenses she incurred. She also found retaining qualified trainers difficult, because the best trainers wanted to demonstrate their skills on horses from many different farms.

After sustaining losses in each of the first five years and losing her onsite trainers, Mrs. Jary-Mathis decided to shift the farm's focus to breeding rather than

[*4] training. She created a written business plan, which stated the operation's new objective: breeding cutting horses with "proven and desirable bloodlines" for which "customers will be willing to pay a premium".

A young cutting horse's value depends largely on its bloodlines. Purchasers evaluate a young horse's potential on the success of its parents. Horses born to parents that have won significant cutting competitions or have produced other winners sell for more than those with less accomplished parents. To build La Brisa Farm's reputation, Mrs. Jary-Mathis sought to develop a premier band of broodmares. She purchased broodmares with strong bloodlines and kept only those that produced successful foals. She often sold young horses to top-level trainers cheaply, because she knew those trainers could win competitions with them. Those horses' success would increase the value of future foals. By the end of 2007 La Brisa Farm possessed an exceptional broodmare collection.

III. Mrs. Jary-Mathis' Role on the Farm

Petitioners hired an onsite breeding manager to perform day-to-day activities, but Mrs. Jary-Mathis oversaw all aspects of the farm's operations and made all important decisions. She typically worked 40 hours per week on farm activities. She spent most of that time researching performance records and identifying stallions to breed with her mares. Her work volume increased to 60

[*5] hours per week during the premier cutting competitions. During cutting events she and her daughter, Maria, showed La Brisa Farm's horses.

Mrs. Jary-Mathis frequently attended cutting horse seminars and attended one on ranching for profit. She continually consulted with cutting horse trainers and other owners to improve her breeding operation. Mrs. Jary-Mathis also chose the farm's marketing methods. She periodically advertised in print and online publications, but the farm did not have a Web site. She identified buyers for her horses primarily by talking with owners and trainers at cutting events.

Although Mrs. Jary-Mathis generally visited La Brisa Farm no more than once a week, she regularly interacted with her horses. Mrs. Jary-Mathis often kept young foals on her personal farm until they were weaned, so she could watch them play and monitor their growth.

IV. Financial Reporting

Petitioners hired Deborah Gorman to keep the farm's books and track their personal finances. She used a computer program to generate financial reports, which Mrs. Jary-Mathis reviewed at least monthly. The financial statements included petitioners' personal items, but the farm items were clearly identifiable. Petitioners provided complete and accurate financial reports to a certified public accountant, who prepared their annual returns. Petitioners have used the same

**[\*6]** accounting firm throughout the farm's history, and the same individual has prepared their returns for each year since 1999.

V. La Brisa Farm Financial Performance

La Brisa Farm has never earned a profit. From 1996 to 2011 petitioners reported cumulative losses on their Schedules F, Profit or Loss From Farming, of $9,152,718. Petitioners' largest losses occurred in the three years at issue here. Since 2008, petitioners' Schedule F losses have decreased substantially as a result of lower reported expenses; petitioners' reported farming income has not increased. Petitioners reported the following Schedule F net losses for the years at issue and beyond:

| Year | Loss |
|------|------|
| 2006 | $868,818 |
| 2007 | 1,102,816 |
| 2008 | 1,360,184 |
| 2009 | 372,174 |
| 2010 | 180,946 |
| 2011 | 255,936 |

On December 31, 2008, La Brisa Farm owned 64 cutting horses, which petitioners' appraiser valued at $1,252,500. Petitioners have never sold a horse for more than $65,000 and typically received much less.

**[*7]**                                        OPINION

## I.  Burden of Proof

The taxpayer generally bears the burden of proving the Commissioner's determinations are erroneous.  Rule 142(a).  The burden of proof may shift to the Commissioner if the taxpayer satisfies certain conditions.  Sec. 7491(a).  However, we decide the section 183 issue on the preponderance of the evidence and, therefore, the burden of proof is not relevant.  See Estate of Bongard v. Commissioner, 124 T.C. 95, 111 (2005).

## II.  Section 183 For-Profit Requirement

Section 183 limits the section 162 trade or business expense deductions a taxpayer may claim for expenses attributable to an activity not engaged in for profit.  Taxpayers may not deduct such expenses to the extent they exceed income generated by the activity less deductions attributable to the activity allowable without regard to whether the taxpayer engaged in the activity for profit.  Sec. 183(b).

Taxpayers engage in an activity for profit when they entertain an actual and honest profit objective in engaging in the activity.  Dreicer v. Commissioner, 78 T.C. 642, 645 (1982), aff'd without opinion, 702 F.2d 1205 (D.C. Cir. 1983); sec. 1.183-2(a), Income Tax Regs.  Whether the requisite profit objective exists is

**[*8]** determined by looking at all the surrounding facts and circumstances. Keanini v. Commissioner, 94 T.C. 41, 46 (1990); sec. 1.183-2(b), Income Tax Regs. We give greater weight to objective facts than to a taxpayer's mere statement of intent. Thomas v. Commissioner, 84 T.C. 1244, 1269 (1985), aff'd, 792 F.2d 1256 (4th Cir. 1986); sec. 1.183-2(a), Income Tax Regs. Evidence from years after the years in issue is relevant to the extent it creates inferences regarding the taxpayer's requisite profit objective in earlier years. E.g., Foster v. Commissioner, T.C. Memo. 2012-207; Bronson v. Commissioner, T.C. Memo. 2012-17.

Section 1.183-2(b), Income Tax Regs., provides a list of factors to consider in evaluating a taxpayer's profit objective: (1) the manner in which the taxpayer carried on the activity; (2) the expertise of the taxpayer or his or her advisers; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that the assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or loss with respect to the activity; (7) the amount of occasional profits earned, if any; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved. No single factor controls. Golanty v. Commissioner, 72 T.C. 411, 426 (1979), aff'd without

**[\*9]** <u>published opinion</u>, 647 F.2d 170 (9th Cir. 1981).  After careful consideration of these factors, we find that petitioners did not engage in their cutting horse activity with a profit motive.  We present our analysis below.

### A.  Manner in Which the Taxpayer Carries on the Activity

The fact that the taxpayer carries on an activity in a businesslike manner and maintains complete and accurate books and records may indicate a profit motive.  Sec. 1.183-2(b)(1), Income Tax Regs.  Characteristics of a businesslike operation include the preparation of a business plan and, in the case of horse breeding and sales, a consistent and concentrated advertising program.  <u>Bronson v. Commissioner</u>, T.C. Memo. 2012-17.  The regulations further provide that a taxpayer's change in operating methods or adoption of new techniques to improve profitability may indicate an overall profit motive.  Sec. 1.183-2(b)(1), Income Tax Regs.

Petitioners maintained complete and accurate books for their cutting horse activity.  Their bookkeeper prepared financial reports, and Mrs. Jary-Mathis reviewed them monthly.  The reports provided Mrs. Jary-Mathis an accurate account of the farm's financial performance.

Petitioners did not create a business plan when they started La Brisa Farm in 1995, but they did when the farm's focus shifted to breeding in 2000.  The

[*10] business plan indicates that petitioners planned to promote their horses "so effectively that customers will be willing to pay a premium". Petitioners have maintained a consistent advertising program. The farm frequently displays its horses at shows and has advertised in print publications and online. Mrs. Jary-Mathis also marketed her horses by talking with industry insiders.

Petitioners argue that the farm's shift in focus from training to breeding represents a change in operating method that indicates a profit motive. We find that petitioners changed their focus not to improve profitability but because they could not keep top-level trainers. The best cutting horse trainers want to demonstrate their skills by training and riding horses from a variety of farms. Because they could not keep good trainers at La Brisa Farm, petitioners decided to focus on breeding instead.

On balance, this factor favors petitioners. They maintained complete and accurate records, created a business plan, marketed their horses, and generally ran the farm in a professional manner.

## B. The Expertise of the Taxpayer or Her Advisers

The taxpayer's expertise, research, and extensive study of an activity, as well as his or her consultation with experts, may indicate a profit motive. See sec. 1.183-2(b)(2), Income Tax Regs. Mrs. Jary-Mathis grew up around ranching and

[*11] learned about cutting horses when she was in high school. When she began her own cutting horse operation, she had help from experienced trainers. Since she started La Brisa Farm, Mrs. Jary-Mathis has frequently discussed training and breeding strategies with prominent figures in the cutting horse industry. She continually performs online research to identify the best horses in the country, and she has attended seminars to learn more about the cutting horse business.

Mrs. Jary-Mathis has developed expertise in breeding quality cutting horses, but she lacks business expertise. Mrs. Jary-Mathis attended a seminar on ranching for profit, but that does not make her an expert. Moreover, she attended the seminar long after she started the activity. Petitioners' failure at the outset to consult experts on the financial aspects of running a cutting horse farm indicates that they lacked a profit motive. See Burger v. Commissioner, 809 F.2d 355, 359 (7th Cir. 1987), aff'g T.C. Memo. 1985-523; Smith v. Commissioner, T.C. Memo. 1997-503, aff'd without published opinion, 182 F.3d 927 (9th Cir. 1999).

C. The Time and Effort Expended by the Taxpayer in Carrying On the Activity

The taxpayer's devotion of much of his or her personal time and effort to carrying on an activity may indicate a profit motive, particularly if the activity

[*12] does not involve substantial personal or recreational aspects. Sec. 1.183-2(b)(3), Income Tax Regs.

Mrs. Jary-Mathis devotes considerable time and effort to La Brisa Farm. She typically spends 40 hours a week on the cutting horse activity and 60 hours a week during the top cutting events. Although Mrs. Jary-Mathis works hard, her work involves substantial personal and recreational aspects. She works with cutting horses, which have been her passion since she was young. She spends time with her daughter at horse shows, and she derives a sense of personal pride from owning high-quality cutting horses. On balance, this factor weighs in petitioners' favor, but the personal and recreational aspects of the activity limit its effect on our overall analysis.

D. The Expectation That Assets Used in the Activity May Appreciate in Value

An expectation that assets used in the activity will appreciate in value may indicate a profit motive even if the taxpayer derives no profit from current operations. Sec. 1.183-2(b)(4), Income Tax Regs. However, we may infer a profit objective from such expected appreciation only when the appreciation exceeds operating expenses and would be sufficient to recoup the accumulated losses of

[*13] prior years.  Foster v. Commissioner, T.C. Memo. 2012-207; see Golanty v. Commissioner, 72 T.C. at 427-428.

Mrs. Jary-Mathis testified that she expects her horses to appreciate in value as her broodmares produce successful foals.  However, petitioners have failed to present evidence that the appreciation will recoup the accumulated losses.  Petitioners have reported over $9 million in losses, and the highest price they have ever received for a horse is $65,000.  Petitioners' expert appraised La Brisa Farm's entire horse inventory at $1,252,500 as of December 31, 2008.  Any appreciation on petitioners' horses only minimally offsets the very large losses petitioners have sustained since beginning their cutting horse activity.

Petitioners also provided some evidence that the La Brisa Farm property has increased in value, but this does not indicate that they had a profit motive for their cutting horse activity.  Petitioners did not purchase the property for investment; they purchased it to breed and train cutting horses.  We must evaluate any profit motive petitioners had in operating the farm separately from any profit motive they had in purchasing the land.  See sec. 1.183-1(d)(1), Income Tax Regs. (providing that the farming and holding of land will ordinarily be considered a single activity only when the taxpayer engages in the farming activity to offset the carrying costs of the land).  Although the land's appreciation would be relevant to petitioners'

[*14] motive in holding the land, it is not relevant to their motive in operating the cutting horse farm. Even if the land's appreciation were relevant to petitioners' profit motive in operating the cutting horse farm, they have not presented sufficient evidence that the appreciation offsets the farm's substantial losses. The evidence in the record concerning appreciation in the farm's assets fails to persuade us that future profits motivated petitioners to continue the cutting horse activity.

E. The Success of the Taxpayer in Other Similar Activities

Section 1.183-2(b)(5), Income Tax Regs., provides: "The fact that the taxpayer has engaged in similar activities in the past and converted them from unprofitable to profitable enterprises may indicate that he is engaged in the present activity for profit, even though the activity is presently unprofitable." None of petitioners' past activities provides evidence of a profit motive here.

F. Taxpayer's History of Income or Losses

A history of continued losses with respect to an activity may indicate that the taxpayer lacked a profit motive. See sec. 1.183-2(b)(6), Income Tax Regs. Although a series of losses during the initial or startup stage of an activity may not necessarily indicate a lack of profit motive, a record of large losses over many

[*15] years is persuasive evidence that the taxpayer did not have such a motive. Golanty v. Commissioner, 72 T.C. at 426; Foster v. Commissioner, T.C. Memo. 2012-207.

Petitioners realized no profits from La Brisa Farm in 13 years. Petitioners claim that they engaged in two separate activities during that period: (1) training from 1995 to 2000 and (2) breeding from 2000 to present. They argue that the breeding operation remained in its startup phase during the years at issue, so the losses during those years do not indicate the absence of a profit motive. We find that the 2000 change was not significant enough to constitute the start of a new activity. Petitioners have bred and trained horses on their farm throughout the entire period. They focused more on breeding after 2000 and moved the training operation offsite, but these changes do not amount to a change in activity. Accordingly, we decline to "reset the clock" as of 2000 simply because petitioners shifted their focus. The startup period for petitioners' cutting horse activity passed before respondent conducted his audit, and the history of losses strongly indicates petitioners lacked a profit motive.

Petitioners reported smaller Schedule F losses for the years following those respondent audited. They cite the diminishing losses as a sign that the farm is nearing profitability. However, the smaller net losses did not result from increased

[*16] sales, only from lower reported expenses. Petitioners reported lower expenses only after they received notice of the audit, which indicates that the audit, not a desire to earn profits, may have triggered the reductions. Accordingly, we give little weight to the decline in expenses petitioners reported in determining whether they had a profit motive.

The current and expected losses of an activity should not be of such a magnitude that an overall profit going forward would not be possible. Bessenyey v. Commissioner, 45 T.C. 261, 274 (1965), aff'd, 379 F.2d 252 (2d Cir. 1967). Petitioners have accumulated over $9 million in losses from their cutting horse activity. It is unrealistic to expect that petitioners would not continue to accumulate significant losses. They have presented no convincing evidence that future profits could possibly offset these losses. Accordingly, this factor weighs heavily against finding a profit motive.

G. Amount of Occasional Profits

The amount of profits in relation to the amount of losses incurred may provide evidence of the taxpayer's intent. Sec. 1.183-2(b)(7), Income Tax Regs. Petitioners have never earned a profit from the cutting horse activity, yet they continue to operate the farm. This indicates that they are running the farm for personal rather than business reasons.

**[*17]**  H.  Taxpayer's Financial Status

Substantial income from sources other than the activity may indicate that the activity is not engaged in for profit.  Sec. 1.183-2(b)(8), Income Tax Regs.  A taxpayer with substantial income unrelated to the activity can more readily afford a hobby.  Foster v. Commissioner, T.C. Memo. 2012-207.  This is particularly true if the losses from the activity might generate substantial tax benefits.  Golanty v. Commissioner, 72 T.C. at 429.  Petitioners' substantial investment income has allowed them to continue the cutting horse operation despite 17 consecutive years of substantial losses.  Petitioners' cutting horse activity also generated tax savings in the form of net losses that offset petitioners' investment income.  This factor weighs against finding a profit objective.

I.  Elements of Personal Pleasure or Recreation

The presence of personal motives and recreational elements in carrying on an activity may indicate that the activity is not engaged in for profit.  Sec. 1.183-2(b)(9), Income Tax Regs.  Mrs. Jary-Mathis enjoys working with horses and derives substantial personal satisfaction from her cutting horse operation.  She enjoys watching the young horses and often brings them to her personal farm to watch them grow.  However, running a large-scale breeding operation takes many

[*18] hours of hard work, and Mrs. Jary-Mathis has sacrificed family and personal time to promote her horses. This factor weighs slightly against a profit motive.

J. Conclusion

After weighing all the facts and circumstances in light of the relevant factors, we conclude that petitioners did not engage in their cutting horse activity with the requisite profit objective. Mrs. Jary-Mathis is determined to be a successful horsewoman. She wants to build a reputation as a producer of top-level cutting horses. However, she has pursued this goal independently of any desire to earn profits. She has continued training and breeding cutting horses for 17 years without ever approaching profitability, yet she has never seriously considered discontinuing operations. Accordingly, we sustain respondent's determination that petitioners did not engage in the cutting horse activity for profit.

III. Accuracy-Related Penalties

Respondent determined that petitioners were liable for an accuracy-related penalty pursuant to section 6662(a) for each of the tax years at issue. Section 6662(a) and (b)(1) and (2) imposes a penalty of 20% on any underpayment attributable to, among other things, (1) negligence or disregard of rules or regulations; or (2) any substantial understatement of income tax. An understatement is substantial if it exceeds the greater of $5,000 or 10% of the

**[\*19]** income tax required to be shown on the return for the taxable year. Sec. 6662(d)(1)(A).

The Commissioner bears the burden of production with respect to this penalty. Sec. 7491©. The Commissioner satisfies the burden by presenting sufficient evidence supporting the relevant penalty. Higbee v. Commissioner, 116 T.C. 438, 446 (2001). Respondent determined that petitioners underpaid their income tax by $320,927, $376,318, and $491,571 for the years 2006, 2007, and 2008, respectively. These amounts exceed the "substantial understatement" threshold for each year in question. Thus, respondent has carried his burden of demonstrating that petitioners substantially understated their income tax.

Pursuant to section 6664(c)(1), the accuracy-related penalty under section 6662 does not apply to any portion of an underpayment for which a taxpayer establishes that he or she: (1) had reasonable cause, and (2) acted in good faith. A taxpayer's failure to comply with section 183 does not preclude a reasonable cause and good faith defense. See, e.g., Rodriguez v. Commissioner, T.C. Memo. 2013-221, at \*57. Whether a taxpayer has acted with reasonable cause and in good faith depends on the facts and circumstances of the case. Relevant factors include the taxpayer's efforts to assess the proper tax liability, the taxpayer's knowledge and

**[\*20]** experience, and the extent to which the taxpayer relied on the advice of a tax professional. Sec. 1.6664-4(b)(1), Income Tax Regs.

Petitioners hired a certified public accountant to prepare their returns. Because the return preparer had signed all of their returns since 1999, she knew the farm's financial history. Petitioners submitted complete and accurate books and records to their accountant and relied on her to properly prepare their returns. Although we find that petitioners lacked a profit motive, we acknowledge that they operated the farm in a professional manner and took their activity seriously. We are persuaded that petitioners had reasonable cause and acted in good faith. Accordingly, we find they are not liable for accuracy-related penalties.

To reflect the foregoing,

<u>Decisions will be entered for</u> <u>respondent as to the deficiencies and for</u> <u>petitioners as to the accuracy-related</u> <u>penalties under section 6662(a)</u>.